*This opinion is subject to revision before final publication in the Pacific Reporter*

**2014 UT 40**

IN THE

# SUPREME COURT OF THE STATE OF UTAH

RALPH LEROY MENZIES,
*Petitioner and Appellant,*

*v.*

STATE OF UTAH,
*Respondent and Appellee.*

No. 20120290
Filed September 23, 2014

Third District, West Jordan Dep't
The Honorable Bruce C. Lubeck
No. 030106629

Attorneys:

Theodore R. Weckel, Jr., Salt Lake City, Craig T. Peterson,
Bountiful, for appellant

Sean D. Reyes, Att'y Gen., Thomas B. Brunker, Asst. Att'y Gen.,
Erin Riley, Asst. Att'y Gen., Salt Lake City, for appellee

CHIEF JUSTICE DURRANT authored the opinion of the Court, in which
ASSOCIATE CHIEF JUSTICE NEHRING, JUSTICE DURHAM,
JUSTICE PARRISH, and JUSTICE LEE joined.

CHIEF JUSTICE DURRANT, opinion of the Court:

**Introduction**

¶1 Nearly twenty-six years ago, a jury convicted Ralph Leroy Menzies of the first degree murder of Maurine Hunsaker. At sentencing, Judge Raymond Uno imposed the death penalty. Since then, we have issued three opinions in Mr. Menzies's case:

two from direct appeals[1] and one from a post-conviction appeal.[2] In Mr. Menzies's first post-conviction appeal, *Menzies III*, we reversed the dismissal of his post-conviction petition and allowed him to amend his petition.[3] He availed himself of this opportunity multiple times, culminating in the filing of a Fifth Amended Petition for Relief Under the Utah Post-Conviction Remedies Act (Fifth Amended Petition). On March 23, 2012, the post-conviction court (PCC)[4] issued an order granting the State summary judgment, denying Mr. Menzies's cross-motion for summary judgment, and dismissing the Fifth Amended Petition.

¶2    Mr. Menzies's current post-conviction appeal to this court (his second) raises numerous claims, which can be separated into three general categories. First, he challenges the constitutionality of the Utah Post-Conviction Remedies Act (PCRA), as well as the PCC's application of the PCRA's funding provisions. Second, he claims that the PCC erred in rejecting several of his post-conviction motions, including motions for an answer from the State, a continuance, and an evidentiary hearing. Finally, he claims that his former counsel provided ineffective assistance, including at trial, sentencing, and on appeal. We reject each of Mr. Menzies's claims and affirm the PCC's order dismissing his Fifth Amended Petition.[5]

---

[1] *State v. Menzies* (*Menzies II*), 889 P.2d 393 (Utah 1994), *cert. denied*, 513 U.S. 1115 (1995); *State v. Menzies* (*Menzies I*), 845 P.2d 220 (Utah 1992).

[2] *Menzies v. Galetka* (*Menzies III*), 2006 UT 81, 150 P.3d 480.

[3] *Id.* ¶ 118.

[4] Throughout this opinion we refer to the post-conviction court that considered Mr. Menzies's Fifth Amended Petition using the acronym "PCC." We do not use this acronym when referring to another post-conviction court or to post-conviction courts generally.

[5] The PCC rejected other claims, but Mr. Menzies does not challenge the rejection of these claims in this appeal. The PCC rejected some of these claims because they were either already raised or could have been raised on direct appeal. They include the following: (1) Mr. Menzies was denied due process because trial transcripts were not available to him, (2) the admission of certain preliminary hearing testimony violated Mr. Menzies's Confrontation Clause rights, and (3) the jury instructions

(continued)

**Background**

¶3    We have recounted the basic facts of this case in our three previous decisions.[6] We recite some of those facts here, along with certain other facts, to help give context to the specific issues raised in this appeal. First, we consider the facts relating to the crime and investigation. Next, we outline the procedural history of this case: (1) the guilt phase of the trial, (2) the penalty phase of the trial, (3) the appellate proceedings, and (4) the post-conviction proceedings.

I. The Crime and Investigation

¶4    During the evening of Sunday, February 23, 1986, Maurine Hunsaker's husband called the Gas-A-Mat gas station where she worked. Mrs. Hunsaker did not pick up. Concerned, Mr. Hunsaker then went to Gas-A-Mat around 10:10 p.m. that same night. When he arrived he found that Mrs. Hunsaker and her purse were gone. The police arrived at the gas station and accompanied Mr. Hunsaker home. At about 11:05 p.m., Mrs. Hunsaker called the Hunsakers' home phone. She stated that "[t]hey told me to tell you they robbed me and got me and that I am fine and they are going to let me go sometime tonight." Mr. Hunsaker noted that Mrs. Hunsaker sounded upset and scared. An officer also spoke to Mrs. Hunsaker on the phone and asked whether the perpetrators robbed her. Mrs. Hunsaker said

---

regarding    eyewitness    identification    testimony    were unconstitutional.

The PCC also rejected several claims that originated in Mr. Menzies's motion for summary judgment. The State argued that the PCC could not consider the claims. The PCC agreed and held that they were procedurally barred because Mr. Menzies did not raise them in his Fifth Amended Petition. They include the following: (1) trial counsel insufficiently involved Mr. Menzies in settlement offers, (2) trial counsel should have sought a hearing on expert testimony regarding the carpet fibers found on Mrs. Hunsaker and in Mr. Menzies's apartment, and (3) trial counsel should have tried to suppress the results of a search of Mr. Menzies's apartment. Mr. Menzies does not appeal the PCC's rejection of these claims either.

[6] *See Menzies III*, 2006 UT 81, 150 P.3d 480; *Menzies II*, 889 P.2d 393 (Utah 1994), *cert. denied*, 513 U.S. 1115 (1995); *Menzies I*, 845 P.2d 220 (Utah 1992).

yes. She also indicated that the perpetrators planned to release her that night or the following morning. The officer then returned the phone to Mr. Hunsaker. Mrs. Hunsaker asked Mr. Hunsaker what she should do. The telephone line disconnected before he could respond.

¶5 Two days later, on Tuesday, February 25, a hiker found Mrs. Hunsaker's body near the Storm Mountain picnic area in Big Cottonwood Canyon. Her throat was cut, her wrists had marks on them, and the bark of a nearby tree was scuffed, suggesting that she was tethered to the tree. A medical examiner determined that ligature strangulation caused Mrs. Hunsaker's death. The examiner also noted that the cut in her throat contributed to her death and that a variety of different knives could have been used to inflict the wound. The examiner's report indicated that the marks on her wrists could have been caused by wire or cord, but it made no mention of handcuffs.

¶6 Meanwhile on February 24, as the police were investigating the events surrounding Mrs. Hunsaker's disappearance, they arrested and booked Mr. Menzies for an unrelated burglary. Mr. Menzies's exact booking time is uncertain. He suggests that the police completed the booking process at 7:59 p.m. He also points out that trial counsel stipulated that he turned over cash to the police around 7:20 p.m. Other evidence in the record suggests that the police began the booking process around 6:40 p.m. During booking, the booking officer asked Mr. Menzies for his possessions. He responded by spinning around, running down a hallway, and ducking into a changing room. He was out of sight for about five to eight seconds. A pursuing officer found Mr. Menzies and saw him "reaching around" to "pull on" his pants. The officer testified that although Mr. Menzies was handcuffed at the time, he could still move his arms. Mr. Menzies explained that he had run and ducked into the changing room because he was looking for a restroom. He did not ask for a restroom again, however, during the hour-and-a-half booking process.

¶7 A jailer found four of Mrs. Hunsaker's identification cards in a laundry hamper located in the changing room into which Mr. Menzies ran.[7] The jailer put the cards in a nearby desk

---

[7] To advance his ineffective assistance claims, Mr. Menzies points out that the record is unclear regarding the exact time the jailer found the identification cards in the hamper. The record is not as unclear as he suggests, however. In fact, it strongly

(continued)

drawer. Another officer later discovered the identification cards in the drawer. The officer who found the cards recognized Mrs. Hunsaker's picture from an earlier news report regarding her disappearance.

¶8 Multiple witnesses alleged they saw Mrs. Hunsaker during the time between her disappearance from the gas station and the finding of her body. First, a witness reportedly saw her at a Denny's restaurant on the night of her disappearance with a man who fit the description of Mr. Menzies's friend, Troy Denter. Second, on February 24, the morning after Mrs. Hunsaker went missing, two high-school students, Tim Larrabee and Beth Brown, saw two people at Storm Mountain who they later said fit the description of Mr. Menzies and Mrs. Hunsaker.

¶9 On Tuesday, February 25, the day after Mr. Larrabee and Ms. Brown visited Storm Mountain, Mr. Larrabee watched television and saw a report that a hiker found Mrs. Hunsaker's body near the Storm Mountain picnic area. The next day, Wednesday, February 26, Mr. Larrabee contacted the police and reported that he and Ms. Brown were at Storm Mountain the morning of Monday, February 24. Mr. Larrabee reported twice seeing a man and a woman walking together away from where he and Ms. Brown were located. He noted that the man had a coat slung over his right shoulder and that he could not tell whether

---

indicates that the jailer most likely found the identification cards on Monday, February 24—the same day the police booked Mr. Menzies. First, Detective Dennis Couch stated in an affidavit for a search warrant of Mr. Menzies's apartment that the jailer found the identification cards on February 24. And second, the jailer testified at trial that he found the cards between 6:30 and 7:00 p.m. on February 24. Mr. Menzies cites to various places in the record to suggest that the jailer in other instances reported finding the identification cards on February 25 and 26. But he appears to misread or misunderstand the record. For instance, in an interview the police asked the jailer when he found the cards. The interview transcript shows that the jailer answered "26th of February." But "26th" is crossed out in the transcript and replaced with "24." Any potential ambiguity can be resolved by reading the answer in context. The interviewing officer followed up the question by asking "[w]ould that be on a Monday." The jailer responded "[y]eah." Mr. Menzies's other record citations are similarly in accord when read in their proper context.

the two were holding hands. He stated that nothing unusual appeared to be going on between the two. He further reported that about ten minutes after he saw the two people, he heard a scream and assumed that the woman either slipped or was frightened by an animal. Approximately fifteen to twenty minutes later, Mr. Larrabee saw a man walking alone towards the nearby parking lot. Mr. Larrabee also said he noticed a 1960s cream-colored vehicle in the parking lot similar to a 1968 Buick Riviera.

¶10 Mr. Larrabee described the man he saw as a white male, twenty-five to thirty years old, 6′1″ tall, and approximately 170 pounds. He noted that the man wore a coat that was either blue-grey or blue-white. He also said the man had black curly hair and either a scraggly beard or sideburns. Mr. Larrabee's description of the man ended up being within one inch in height and ten pounds in weight of Mr. Menzies. Mr. Larrabee said he could probably identify the man if he saw a picture, but that he could not identify the woman. Police detective Richard Judd created a composite drawing using Mr. Larrabee's description.

¶11 Two days later on Friday, February 28, after comparing the composite drawing with photographs from over two hundred inmates booked between February 23 and February 25, the police selected six photos from that group for Mr. Larrabee to view. Mr. Menzies's picture was one of the photos the police picked from the pool. The police considered Mr. Menzies a suspect by the time they showed the photos to Mr. Larrabee.[8] Detective Judd testified that they tried to make it as hard as possible for Mr. Larrabee to identify Mr. Menzies. The police then showed Mr. Larrabee the array of photos. Mr. Larrabee initially made no positive identification. He asked to see the array again. After further review, he selected Mr. Menzies's photo as looking the most like the man he saw at Storm Mountain.

¶12 About three months after Mr. Larrabee viewed the photo array, the police conducted a lineup that included Mr. Menzies. At the lineup, Mr. Larrabee identified someone other than Mr. Menzies as the man he saw at Storm Mountain. Apparently,

---

[8] The State's brief states that the "[p]olice had not yet identified Menzies as a suspect" during the time they created the photo array. At oral argument the State conceded, however, that its initial position was incorrect and that in fact the police did consider Mr. Menzies a suspect at the time they assembled the photo array.

Mr. Larrabee later felt he made a mistake and asked the prosecutor whether number six in the lineup was the suspect. Mr. Menzies was suspect number six. Later at trial, the court instructed the jury not to consider Mr. Larrabee's testimony regarding his confirmatory request to the prosecutor.

¶13 The same day the police showed Mr. Larrabee the photo array, they also interviewed Mr. Menzies's friend Troy Denter. Mr. Denter told them that he loaned his cream-colored 1974 Chevrolet to Mr. Menzies some time during the afternoon of Sunday, February 23. Mr. Menzies apparently told Mr. Denter he planned to return the car around 10:00 p.m. Sunday night. Mr. Menzies did not return the car on time. Mr. Denter called Mr. Menzies's apartment phone number around 10:00 p.m. Mr. Menzies's girlfriend, Nicole Arnold, answered and stated he was not there. Mr. Denter called again around 11:00 p.m., but Mr. Menzies was still away. Mr. Denter called one more time around 1:00 a.m. Mr. Menzies answered and asked if he could keep the car until the next morning because he had "one more order of business to take care of." But Mr. Menzies did not return the car until about noon the next day, Monday, February 24. He used about twelve and one-half gallons of gas during the time he borrowed Mr. Denter's car. After retrieving his car, Mr. Denter found a box labeled "handcuffs" under the driver's seat.

¶14 After interviewing Mr. Denter, the police escorted Mr. Larrabee out to a nearby parking terrace to determine whether Mr. Larrabee might be able to identify the car he saw at Storm Mountain. The police had earlier parked the cream-colored 1974 Chevrolet owned by Mr. Denter among the other cars. Mr. Larrabee tentatively identified Mr. Denter's car as looking like the one he saw at Storm Mountain. Ms. Brown also tentatively identified Mr. Denter's car as the car she saw in the Storm Mountain parking lot.

¶15 The police questioned Mr. Menzies after hearing Mr. Larrabee's eyewitness account. Mr. Menzies told them that on the night he borrowed Mr. Denter's car, he picked up a woman on State Street and then picked up Ms. Arnold. He drove around with both women until the two began to fight. He dropped off Ms. Arnold and then dropped the other woman off somewhere around 7200 West and 2400 South. He stated that he then went home to talk to Ms. Arnold.

¶16 The police discovered numerous pieces of evidence indicating that Mr. Menzies killed Mrs. Hunsaker. They found Mrs. Hunsaker's thumbprint in Mr. Denter's car. They found that

approximately $116 was missing from the Gas-A-Mat cash register.[9] This amount was approximately the same amount of money that was later found in Mr. Menzies's apartment. After being booked for the unrelated burglary offense, Mr. Menzies asked Mr. Denter to retrieve $115 from his apartment. Mr. Denter spent about $25. Ms. Arnold's mother later found $90 hidden in Mr. Menzies's apartment. Ms. Arnold's mother also found handcuffs in a maroon and grey parka belonging to Mr. Menzies. The police ordered a chemical analysis comparing fibers of Mr. Menzies's green shag carpet with green fibers on Mrs. Hunsaker's clothing. That analysis found similarities in the color, diameter, shape, and content of the fibers. The police seized a buck knife from Mr. Menzies's apartment that was capable of causing the wounds on Mrs. Hunsaker's neck. The police also seized a brown suede purse from Mr. Menzies's apartment, and Mr. Hunsaker testified that the purse belonged to Mrs. Hunsaker. Six months after Mr. Menzies's arrest, Ms. Arnold's stepfather found Mrs. Hunsaker's social security card in Ms. Arnold's belongings. Finally, another jail inmate, Walter Britton, testified at Mr. Menzies's preliminary hearing that Mr. Menzies confessed that he killed Mrs. Hunsaker. According to Mr. Britton, Mr. Menzies also stated that slitting her throat was one of the biggest thrills of his life.

## II. Procedural History

¶17 Much of this appeal centers on the effectiveness of Mr. Menzies's trial and appellate counsel. In each instance, attorneys from the Salt Lake Legal Defender Association (LDA) represented Mr. Menzies. Below we consider Mr. Menzies's claims that his counsel rendered ineffective assistance.[10] We now briefly describe the guilt-phase, penalty-phase, appellate, and post-conviction proceedings to provide some necessary context.

### A. Guilt-Phase Proceedings

¶18 Brooke Wells, currently a federal magistrate judge, acted as lead counsel in Mr. Menzies's case.[11] Frances Palacios acted as

---

[9] The record is unclear regarding exactly how much money was missing because of the gas station's loose accounting practices.

[10] *See infra* ¶¶ 71–223.

[11] Throughout this opinion we refer to Judge Brooke Wells as "Ms. Wells" because at the time of her representation of

(continued)

co-counsel and second chair in the case. The defense theory advocated by Ms. Wells and Ms. Palacios is described in depth below. In short, they relied on a failure-of-proof defense.[12] This defense consisted of two parts. First, they argued that the State could not prove beyond a reasonable doubt that Mr. Menzies killed Mrs. Hunsaker. And second, they argued that the State could not prove an aggravator that would support a capital conviction. After a month-long trial, a jury rejected the failure-of-proof defense theory and convicted Mr. Menzies of capital homicide and aggravated kidnapping.

## B. Penalty-Phase Proceedings

¶19 Ms. Wells and Ms. Palacios also acted as the lead attorneys during the penalty phase of the proceedings. In that phase, Mr. Menzies waived his right to a jury. During the penalty phase, the State argued that Judge Uno should impose the death penalty. In making this argument, the State relied primarily on the evidence produced during the guilt-phase proceedings and on Mr. Menzies's criminal history. Trial counsel proffered mitigation and background evidence to suggest that Mr. Menzies should not receive a death sentence. After considering trial counsel's mitigation defense, Judge Uno imposed the death penalty.

---

Mr. Menzies she was not a sitting judge. Further, we refer to Ms. Wells and Ms. Palacios collectively as "trial counsel."

[12] Mr. Menzies repeatedly asserts that trial counsel did not rely on a failure-of-proof defense. He suggests instead that trial counsel's "principal theory was that the victim . . . voluntarily risked losing her job, her marriage, and custody of her children, for a date with a mentally ill stranger because she was clinically depressed." There are statements by trial counsel in the record that suggest as much. But read in context, these statements go to the second part of trial counsel's two-part failure-of-proof strategy—whether the State could prove an aggravator that would support a capital conviction. Trial counsel's defense strategy did not rely solely on the notion that Mrs. Hunsaker left with Mr. Menzies voluntarily. Trial counsel's closing argument summarizes the defense theory as follows: "[w]hat you must do today [is] decide has the State proved beyond a reasonable doubt that this is a first degree homicide. . . . you then determine if it has been proved beyond a reasonable doubt that Mr. Menzies, the person accused, is the one who committed that offense."

### C. *Appellate Proceedings*

¶20 After penalty-phase proceedings concluded, Mr. Menzies moved for a new trial and grounded his motion largely on the basis of errors in the trial transcript. The trial court rejected his motion. Mr. Menzies appealed that denial. On appeal, LDA again represented Mr. Menzies. Joan Watt acted as lead appellate counsel. We affirmed the trial court's denial of Mr. Menzies's motion for new trial.[13] Mr. Menzies next brought a direct appeal on the merits and argued that numerous errors occurred at trial. We dismissed that appeal as being "without merit."[14]

### D. *Post-Conviction Proceedings*

¶21 In *Menzies III*, we detailed at length the first decade of Mr. Menzies's post-conviction proceedings.[15] We recite only a small portion of those proceedings here.

¶22 Mr. Menzies, with the help of pro bono counsel, began post-conviction proceedings by filing a petition for post-conviction relief on April 20, 1995. He then filed an amended petition on May 2, 1995. In 1997, after the PCRA took effect, the state notified Mr. Menzies that he might be entitled to receive payment from the state for litigation costs and attorney fees. The next year, Edward Brass began serving as Mr. Menzies's counsel. Mr. Brass filed a two-page second amended petition for post-conviction relief on August 31, 1998. Over approximately the next five years, Mr. Brass "willfully neglect[ed]" Mr. Menzies's case.[16] In late 2003, Elizabeth Hunt replaced Mr. Brass as Mr. Menzies's counsel. Ms. Hunt sought to undo the damage done to Mr. Menzies's case by Mr. Brass and filed a rule 60(b) motion seeking to set aside a default judgment entered against Mr. Menzies. That filing led to our decision in *Menzies III*. There we held that Mr. Menzies had a statutory right to effective assistance of post-conviction counsel under the PCRA.[17] We determined that Mr. Brass's representation constituted ineffective assistance of counsel and ordered that Mr. Menzies be given the

---

[13] *Menzies I*, 845 P.2d 220, 242 (Utah 1992).

[14] *Menzies II*, 889 P.2d 393, 406 (Utah 1994), *cert. denied*, 513 U.S. 1115 (1995).

[15] *Menzies III*, 2006 UT 81, ¶¶ 3–48, 150 P.3d 480.

[16] *Id.* ¶ 110.

[17] *Id.* ¶ 82.

opportunity to investigate his claims and file another amended post-conviction petition.[18]

¶23 In 2008, the legislature responded to our *Menzies III* decision by amending the PCRA. We have previously recognized that the 2008 amendments were a response to our holding in *Menzies III* that the PCRA granted a right to effective assistance of post-conviction counsel.[19] Under the amended version, the PCRA expressly states it does not confer a right to effective assistance of counsel in post-conviction proceedings.[20]

¶24 On remand, Richard Mauro initially represented Mr. Menzies. He withdrew as counsel, however, after challenging the state's payment schedule. Craig Peterson, Mr. Menzies's current co-counsel, began representing him in early 2009. Theodore Weckel, Mr. Menzies's current lead counsel, also began representing him in 2009. Mr. Weckel and Mr. Peterson filed numerous motions with the PCC seeking additional discovery and investigation. They filed a third amended petition for post-conviction relief on October 12, 2010, a fourth amended petition on January 10, 2011, and a fifth amended petition on March 14, 2011. The Fifth Amended Petition lists twenty-seven claims for relief. The State responded to the Fifth Amended Petition by filing a motion for summary judgment on May 17, 2011. Mr. Menzies filed an opposition to the State's motion along with a cross-motion for summary judgment on August 1, 2011. The State filed a reply on November 1, 2011. In addition to his motion for summary judgment, Mr. Menzies filed motions seeking an evidentiary hearing, a rule 56(f) extension, and to supplement the record, each of which the PCC denied.

¶25 On March 23, 2012, the PCC issued an order granting the State's summary judgment motion, denying Mr. Menzies's cross-motion for summary judgment, and dismissing the Fifth Amended Petition. Mr. Menzies timely appealed the PCC's order

---

[18] *Id.* ¶ 111.

[19] *See Carter v. State*, 2012 UT 69, ¶ 37, 289 P.3d 542 ("In an apparent response to [*Menzies III*], the legislature amended the PCRA in 2008.").

[20] UTAH CODE § 78B-9-202(4) ("Nothing in this chapter shall be construed as creating the right to the effective assistance of postconviction counsel, and relief may not be granted on any claim that postconviction counsel was ineffective.").

by filing a notice of appeal on March 28, 2012. We have jurisdiction pursuant to Utah Code Section 78A-3-102(3)(i).

**Standard of Review**

¶26 Mr. Menzies raises three categories of claims on appeal: (1) constitutional claims challenging the PCRA, (2) procedural claims that stem from the PCC's pre-judgment rulings, and (3) claims of ineffective assistance of counsel.[21] We assess each of these issues under a different standard of review, described below, and also note the overarching standard of review for a grant of summary judgment, which is at issue in this case.

¶27 First, Mr. Menzies challenges the constitutionality of the PCRA, as well as the PCC's funding decisions under the PCRA. "Constitutional issues . . . are questions of law that we review for correctness,"[22] but "we will review [a] postconviction court's denial of [a petitioner's] funding request for an abuse of discretion."[23]

¶28 Second, Mr. Menzies challenges several of the PCC's procedural rulings. He first claims that due process and rule 65C of the Utah Rules of Civil Procedure required the State to file an answer before moving for summary judgment. Interpretation of a rule and constitutional claims each present a question of law that

---

[21] A significant portion of Mr. Menzies's brief is devoted to showing that the PCC's "de facto findings of fact from the record were erroneous." In reviewing a lower court's findings of fact, "[w]e apply the clearly erroneous standard." *State v. Hutchings*, 2012 UT 50, ¶ 8, 285 P.3d 1183. Mr. Menzies's argument here fails for the simple reason that the PCC made no findings of fact. Several times in its opinion the PCC specifically noted that it was not finding or determining facts. Rather the court stated it was "merely recit[ing facts] from the record . . . to demonstrate the basic factual situation involved in this case." The PCC assumed that "all the facts [Mr. Menzies] alleges are true" and held that even under this assumption Mr. Menzies's claims failed. Other parts of Mr. Menzies's opening brief concede the point that "the PCC did not make findings of fact." Because there are no findings of fact to review, we reject Mr. Menzies's claim that the PCC's findings of fact were clearly erroneous.

[22] *State v. Martinez*, 2013 UT 23, ¶ 6, 304 P.3d 54 (internal quotation marks omitted).

[23] *Honie v. State*, 2014 UT 19, ¶ 29.

we review for correctness.[24] Second, he claims that the PCC erred in denying his rule 56(f) motion for a continuance. We review a decision granting or denying a rule 56(f) motion for an abuse of discretion and "will not reverse the district court's decision . . . unless it exceeds the limits of reasonability."[25] Third, he claims that the PCC erred in denying him an evidentiary hearing under rule 43(b) of the Utah Rules of Civil Procedure. We review a decision granting or denying a rule 43(b) motion for an abuse of discretion.[26] With respect to both rule 56(f) and rule 43(b), we recognize that while we review the ultimate determination of whether to grant or deny these motion for an abuse of discretion, a district court may make findings of fact or conclusions of law in reaching that ultimate determination. And as to those decisions we review findings of fact under a "clearly erroneous" standard and conclusions of law under a "de novo" standard.[27]

¶29 Third, Mr. Menzies brings claims of ineffective assistance of counsel. "[W]e review a lower court's purely factual findings for clear error, but [we] review the application of the law to the facts for correctness."[28]

¶30 Finally, because Mr. Menzies's appeal is from the PCC's grant of summary judgment to the State, our standard of review regarding summary judgment is relevant here. "[W]e review a

---

[24] *State v. Phong Nguyen*, 2012 UT 80, ¶ 8, 293 P.3d 236 ("Interpretation of a rule presents a question of law that we . . . review for correctness."); *Martinez*, 2013 UT 23, ¶ 6 ("Constitutional issues . . . are questions of law that we review for correctness." (internal quotation marks omitted)).

[25] *Overstock.com, Inc. v. SmartBargains, Inc.*, 2008 UT 55, ¶ 20, 192 P.3d 858 (internal quotation marks omitted).

[26] *Stan Katz Real Estate, Inc. v. Chavez*, 565 P.2d 1142, 1143 (Utah 1977) ("We recognize, of course, that trial judges have [] discretion to hear and determine ordinary motions either on affidavits or oral testimony portraying facts not appearing of record." (internal quotation marks omitted)).

[27] *Manzanares v. Byington (In re Adoption of Baby B.)*, 2012 UT 35, ¶¶ 40–41, 308 P.3d 382 (internal quotation marks omitted).

[28] *Archuleta v. Galetka*, 2011 UT 73, ¶ 25, 267 P.3d 232, *cert. denied*, 133 S. Ct. 112 (2012) (second alteration in original) (internal quotation marks omitted).

grant of summary judgment for correctness, granting no deference to the [lower] court. We affirm a grant of summary judgment when the record shows that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."[29] Part III of this opinion further develops the implications of our summary judgment standard in the context of this case.

## Analysis

¶31 Mr. Menzies makes numerous post-conviction claims, which can be separated into three general categories. First, he raises several claims relating to the PCRA, including constitutional claims and challenges to the PCC's application of the PCRA's funding provisions. Second, he argues that the PCC erred in rejecting his procedural claims, including that (1) the State must answer his petition for post-conviction relief, (2) he is entitled to a rule 56(f) continuance, and (3) the PCC must hold an evidentiary hearing before ruling on the cross-motions for summary judgment. Third, and last, he raises ineffective assistance of counsel claims stemming from his counsel's performance at the guilt phase, penalty phase, and appellate phase of the proceedings.

¶32 Part I of this section discusses Mr. Menzies's challenges to funding under the PCRA. Mr. Menzies first argues that the PCRA's funding provisions violate the United States and Utah constitutions. We reject these claims because Mr. Menzies fails to establish that he has a right to funded post-conviction counsel. Additionally, Mr. Menzies argues that the PCC abused its discretion in denying further funding. We conclude that the PCC did not abuse its discretion in concluding that the funds given to Mr. Menzies have been more than "reasonable" and that he cannot show that "good cause" justifies further funding.

¶33 Part II of this section discusses Mr. Menzies's procedural claims. We affirm the PCC's denial of each of these claims. We first conclude that the State was not required to answer Mr. Menzies's Fifth Amended Petition, because rule 65C of the Utah Rules of Civil Procedure allows the State to respond to a petition for post-conviction relief with a motion for summary judgment. We then examine Mr. Menzies's claim that he is entitled to a rule 56(f) continuance and conclude that the PCC did

---

[29] *Ross v. State*, 2012 UT 93, ¶ 18, 293 P.3d 345 (alteration in original) (internal quotation marks omitted).

not abuse its discretion in denying Mr. Menzies a continuance. Next, we address Mr. Menzies's claim that the PCC should have held an evidentiary hearing before ruling on the cross-motions for summary judgment and conclude that the PCC did not abuse its discretion in denying Mr. Menzies an evidentiary hearing.

¶34 Finally, in Part III of this section we analyze Mr. Menzies's ineffective assistance of counsel claims. We conclude that all but two of these claims are properly before us because LDA represented Mr. Menzies at both trial and on appeal.[30] As to those claims that are properly before us, we affirm the PCC's decision on each because Mr. Menzies is unable to make a sufficient showing of deficient performance and prejudice under *Strickland v. Washington*.[31]

---

[30] Two of Mr. Menzies's ineffective assistance claims are not properly before us. They include (1) counsel was ineffective by failing to raise a due process challenge based on the jury seeing Mr. Menzies handcuffed, and (2) trial counsel should have advised Mr. Menzies of the option to plead guilty under *North Carolina v. Alford*, 400 U.S. 25 (1970). As we explain below, *infra* ¶ 72 n.69, both of these claims are procedurally barred because Mr. Menzies did not raise them in his Fifth Amended Petition.

[31] 466 U.S. 668 (1984).

Opinion of the Court

## I. Mr. Menzies's PCRA Claims Fail Because He Has not Established that He Has a Constitutional Right to Funded Post-Conviction Counsel and the PCC Did not Abuse Its Discretion in Holding that the State Has Provided Mr. Menzies with Reasonable Funds

### A. *Mr. Menzies Has not Established that He Has a Constitutional Right to Funded Post-Conviction Counsel*[32]

¶35 Mr. Menzies first raises constitutional challenges to the PCRA: he claims that (1) the PCRA violates Utah's right to counsel since it interferes with counsel's independent decision-making, (2) the PCRA "facilitates arbitrary death sentences" because it fails to give adequate resources to investigate before requiring counsel to prove what he or she would find in discovery, and (3) the PCRA is inconsistent with Utah's Due Process Clause. The main contention in each of these claims is that the PCRA's funding limits restrict his rights to counsel and due process, since they prevent counsel from engaging in "vigorous advocacy." In support of each of these claims, Mr. Menzies cites generally to the Sixth Amendment and Utah's due process clause. The PCC rejected Mr. Menzies's constitutional claims. We affirm and reject each of these claims.

¶36 All of Mr. Menzies's constitutional arguments presume that he has the constitutional right to funded post-conviction counsel. In fact, all of his arguments, including his due process argument, specifically turn on whether he has this right. As a

---

[32] Before oral argument, we requested that both parties prepare to discuss whether the PCRA applied at all to Mr. Menzies's claims, given that his initial post-conviction petition was filed before the effective date of the PCRA. But we decline to reach this issue in our decision, as we also declined to do in *Honie v. State*, 2014 UT 19, ¶ 84 n.12, since neither party has challenged the applicability of the PCRA to Mr. Menzies's claims on appeal. In essence, our holding in *Menzies III* served to wipe the slate clean and provide Mr. Menzies with an opportunity to file an amended post-conviction petition, which he did in 2010. *Menzies III*, 2006 UT 81, ¶ 111, 150 P.3d 480. We therefore assume, for purposes of this appeal, that the version of the PCRA in force at the time he filed his Fifth Amended Petition governs, which includes the funding provisions contained in the 2008 amendments to the PCRA that provide the basis for Mr. Menzies's funding challenge.

matter of federal constitutional law, this presumption is clearly incorrect—post-conviction petitioners are neither entitled to counsel nor funding for counsel.[33] Mr. Menzies also cites no Utah authority, or any other authority for that matter, to support the point that the Utah Constitution affords him these rights.[34] Because Mr. Menzies presumes, rather than establishes, that he has a right to funding under both the United States and Utah constitutions, his three aforementioned constitutional claims fail.

### B. *The PCC Did not Abuse its Discretion in Denying Mr. Menzies Further PCRA Funding*

¶37 We also conclude that the PCC did not abuse its discretion in denying Mr. Menzies's requests for additional funding. The PCRA provides for "reasonable" attorney fees and litigation costs, with presumptive limits of $60,000 for attorney fees and $20,000 for litigation costs.[35] In assessing what constitutes "reasonable" fees or whether a petitioner has demonstrated "good cause," the court examines two factors: (1) whether further research or investigation would be duplicative, and (2) whether the outcome of such research or investigation is "reasonably likely" to support post-conviction relief.[36]

¶38 Mr. Menzies was afforded significant sums both for post-conviction representation and for litigation costs. In fact, his lead counsel was paid over $194,000 and permitted over $60,000 in litigation expenses. Mr. Menzies hired several investigators and experts, and he was also allowed to interview his prior attorneys

---

[33] *Coleman v. Thompson*, 501 U.S. 722, 752 (1991) ("There is no constitutional right to an attorney in state post-conviction proceedings. Consequently, a petitioner cannot claim constitutionally ineffective assistance of counsel in such proceedings." (internal citations omitted)).

[34] As to his due process argument specifically, Mr. Menzies cites only to *Menzies III* to support his contention that the PCRA violates his right to due process under the Utah Constitution. This argument is unfounded, as "we [did] not address his federal and state constitutional claims" in that case—our holding was limited to the statutory guarantees of the PCRA. *Menzies III*, 2006 UT 81, ¶ 84.

[35] UTAH CODE § 78B-9-202(3).

[36] *See id.* § 78B-9-202(3)(a), (b), (e).

and numerous witnesses. It was only after the extended discovery period closed that the court began to limit funding and discovery requests, particularly after learning that counsel had been paid well over three times the presumptive limit since 2006. The PCC examined Mr. Menzies's additional requests for discovery, the evidence already uncovered through post-conviction discovery, and the amounts already afforded to counsel, and it determined that further discovery would be unnecessary, speculative, or duplicative.

¶39 We agree that Mr. Menzies's additional requests for discovery were speculative and sought evidence that would have been either unnecessary or duplicative. We briefly examine several of his specific requests here to illustrate the general nature of his numerous additional discovery requests.

¶40 To begin, Mr. Menzies requested additional time to interview the identification expert who determined that the fingerprint on Mr. Denter's car belonged to Mrs. Hunsaker. He also sought additional resources to hire his own fingerprint expert. The PCC denied these requests because it found that he "failed to provide the court with any legitimate, common-sense, good-faith basis for believing that investigating the fingerprint evidence will lead to the discovery of facts that would support a finding of prejudice." We agree. Mr. Menzies's request was speculative because he provided no basis for concluding that the original fingerprint expert would testify any differently than he did over twenty years earlier. Further, nothing in the record supports the conclusion that the fingerprint evidence was in any way questionable. His requests were also unnecessary and duplicative given the PCC's finding that he never indicated "what he believes an independent fingerprint expert might say after reviewing the fingerprint evidence." In essence, Mr. Menzies provided the PCC with no basis for granting his request other than his hope that the additional discovery might turn up something favorable to his case.

¶41 As another example, Mr. Menzies asked to depose Detective Judd in hopes that he might admit that (1) he planted Mrs. Hunsaker's identification in the laundry hamper, (2) he improperly influenced Mr. Larrabee during the identification process, and (3) the police searched Mr. Menzies's apartment illegally. These allegations are completely unsupported in the record and are entirely speculative. Mr. Menzies provided the PCC with no reasonable basis for assuming that Detective Judd actually did any of these things or would have admitted such.

¶42 Another of Mr. Menzies's discovery requests speculated that Ms. Wells might admit in a second deposition that she never "interviewed Larrabee and Brown, and was unaware of their sexual activity." Even if true, Mr. Menzies does not show how this finding would matter. As discussed more fully below, the jury was fully aware that Mr. Larrabee was distracted at the time he saw the man and woman together at Storm Mountain.[37] Knowing exactly what he and Ms. Brown were doing at the time would have had no impact on the case. Furthermore, this request was duplicative because Mr. Menzies deposed Ms. Wells during post-conviction discovery and did not justify any need to depose her a second time.

¶43 Based on the evidence before the PCC, we conclude that the court did not abuse its discretion in denying Mr. Menzies's additional discovery requests and concluding that he did not sufficiently demonstrate good cause for additional funds, since the requested discovery would have been either unnecessary, speculative, or duplicative.

## II. The PCC Did not Err in Allowing the State to File a Motion for Summary Judgment and in Denying Mr. Menzies's Motions for a Continuance and Evidentiary Hearing

¶44 Mr. Menzies makes three procedural claims: (1) the PCC should have required the State to answer his Fifth Amended Petition before allowing it to file a motion for summary judgment, (2) the PCC wrongly denied Mr. Menzies's rule 56(f) motion for a continuance, and (3) the PCC was required to hold an evidentiary hearing before ruling on the parties' summary judgment motions.

¶45 First, rule 65C of the Utah Rules of Civil Procedure does not require the State to answer Mr. Menzies's petition before filing a motion for summary judgment. Second, the PCC did not abuse its discretion in denying Mr. Menzies's rule 56(f) motion. And finally, the PCC did not abuse its discretion in declining to hold an evidentiary hearing before ruling on the parties' cross-motions for summary judgment. Accordingly, we affirm the PCC's rulings on each of Mr. Menzies's procedural claims.

---

[37] *See infra* ¶ 141.

Opinion of the Court

*A. Rule 65C of the Utah Rules of Civil Procedure Allows the State to Respond to a Post-Conviction Petition with a Motion for Summary Judgment Rather than an Answer*

¶46  Mr. Menzies contends that the PCC should have required the State to answer his Fifth Amended Petition before filing a motion for summary judgment. We disagree. Rule 65C of the Utah Rules of Civil Procedure does not mandate that the State first answer Mr. Menzies's petition before filing a motion for summary judgment.[38]

¶47 Mr. Menzies argues that the language of rule 65C requires a post-conviction court to first assess whether the petition is frivolous; if the court determines it is not frivolous, then the State must file an answer.[39] We reject Mr. Menzies's argument because his reasoning contradicts the text of rule 65C and our prior cases interpreting the rule.

¶48 Rule 65C provides that "if any claim in the petition appears frivolous on its face, the court shall forthwith issue an

---

[38] It is unclear under which post-conviction procedural rule the parties believe they are operating. Mr. Menzies's brief vacillates on which post-conviction procedural rule applies in his case. At points Mr. Menzies argues that rule 65B applies in this case. At other points, he suggests rule 65C applies. Mr. Menzies's Fifth Amended Petition specifically states that he petitions "pursuant to . . . Utah Rule of Civil Procedure 65C." The State, for its part, does not cite either rule in its brief. The PCC concluded that the current version of rule 65C applies in Mr. Menzies's case.

As we note above, *supra* n.32, both parties agree that the PCRA applies to Mr. Menzies's Fifth Amended Petition. This dictates that rule 65C applies, not rule 65B, because rule 65C's scope includes "proceedings in all petitions for post-conviction relief filed under the Post-Conviction Remedies Act." UTAH R. CIV. P. 65C(a).

[39] Mr. Menzies has actually argued that "[r]ule 65B(b)(6)" requires the State to answer his Fifth Amended Petition. As we note above, rule 65B is not the applicable procedural rule in this case because Mr. Menzies's Fifth Amended Petition is governed by the PCRA. But because his argument focuses on language shared by rule 65B(b)(6) and rule 65C(k)–requiring that the respondent "answer or otherwise respond"–we address his argument as it relates to this shared language.

order dismissing the claim."[40] If the claim is not frivolous, then "the respondent shall answer *or otherwise respond* to the portions of the petition that have not been dismissed and shall serve the answer *or other response* upon the petitioner in accordance with Rule 5(b)."[41] The petitioner may then respond "[w]ithin 30 days . . . after service of any motion to dismiss *or for summary judgment*."[42]

¶49 Mr. Menzies's interpretation of the text of rule 65C(k) focuses on the word "answer" and glosses over the text of the rest of the rule. The words "or otherwise respond" and "or other response" read in conjunction with the sentence giving petitioners thirty days to respond after service of motions "for summary judgment" conclusively establish that summary judgment procedures are appropriate under rule 65C. There is nothing in the text of rule 65C that suggests that the State *must* file an answer before a motion for summary judgment.

¶50 In prior decisions we have reached a similar conclusion. In *Archuleta v. Galetka*, we rejected essentially the same argument that Mr. Menzies makes here and noted that "[the] argument that a district court may never render summary judgment in a death penalty case is simply wrong."[43] In that case we affirmed the post-conviction court's grant of summary judgment to the state.[44] Although there we did not decide whether rule 65B or rule 65C governed the petitioner's claims (because the result would have been the same regardless of which rule applied), our opinion stated that summary judgment was appropriate in either case.[45]

¶51 Mr. Menzies also argues that due process dictates that the State respond to his post-conviction petition with an answer rather than a motion for summary judgment. We reject this

---

[40] UTAH R. CIV. P. 65C(h)(1).

[41] *Id.* 65C(k) (emphases added).

[42] *Id.* (emphasis added).

[43] 2011 UT 73, ¶ 49, 267 P.3d 232, *cert. denied*, 133 S. Ct. 112 (2012).

[44] *Id.* ¶ 170.

[45] *Id.* ¶ 48 (concluding that petitioner's argument that the post-conviction court erred in dismissing his claims on summary judgment "fails whether Archuleta's petition is governed by common law habeas corpus rules or by the PCRA").

argument because he has provided no applicable authority or justification for this contention. The only authority he points to in this regard is *Rashidi v. Albright*, a case decided by a federal district court in Nevada.[46] There the court interpreted Federal Rule of Civil Procedure 56(b), which governs summary judgment, and concluded that the rule did not preclude courts from ruling on a summary judgment motion before a defendant files an answer to the complaint.[47] But the court also noted that "[i]n some instances it may be necessary for a court to order defendants to file a responsive pleading before deciding the motion for summary judgment."[48] The court did not enumerate a precise set of "instances" that would require the filing of a responsive pleading first but noted only that such practice would be helpful "[i]n certain contexts . . . to help clarify issues and assist the court in determining whether there are any genuine issues of fact."[49]

¶52 *Rashidi* does not support Mr. Menzies's argument that due process required the State to answer his petition. In fact, it does just the opposite by allowing parties to respond to a complaint with a motion for summary judgment. Only "[i]n some instances" should a court order a party to respond with an answer first, and this case is not one of those instances.[50] As the PCC noted, the existing record and Mr. Menzies's evidentiary proffer provided the PCC with ample ability to "provide a meaningful review of the issues." Mr. Menzies points to no other binding or persuasive authority for the contention that rule 65C violates due process.

¶53 Mr. Menzies's argument that the State must file an answer misreads the text of rule 65C and our decisions interpreting the rule. The PCC correctly held that rule 65C allows the State to file a motion for summary judgment instead of an answer.

---

[46] 818 F. Supp. 1354 (D. Nev. 1993).

[47] *Id.* at 1357.

[48] *Id.*

[49] *Id.*

[50] *Id.*

*B. The PCC Did not Abuse Its Discretion in Denying Mr. Menzies a Rule 56(f) Continuance or in Denying Him a Rule 43(b) Evidentiary Hearing*

¶54 Next, Mr. Menzies claims that the PCC should have granted him a rule 56(f) continuance to conduct additional discovery and that it should have held an evidentiary hearing before ruling on the cross-motions for summary judgment. We conclude that the PCC did not abuse its discretion in denying both requests.

1. The PCC Did not Abuse its Discretion in Denying Mr. Menzies's Motion for a Rule 56(f) Continuance

¶55 Mr. Menzies argues that the PCC abused its discretion in denying his motion for a rule 56(f) continuance. He filed his motion for a rule 56(f) continuance in June 2011, which the PCC denied three months later. He then filed several motions for reconsideration and renewals of the motion. In each case, the PCC denied his requests. We affirm.

¶56 As we noted above, "[w]e review the denial of a rule 56(f) motion for an abuse of discretion."[51] "Under this standard, we will not reverse unless the decision exceeds the limits of reasonability."[52] Rule 56(f) allows courts to order a continuance where a party opposing summary judgment is unable to present affidavits that are essential to the party's opposition. In full, rule 56(f) provides as follows:

> Should it appear from the affidavits of a party opposing the motion [for summary judgment] that the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just.

In *Overstock.com, Inc. v. SmartBargains, Inc.*, we identified some relevant factors for determining whether a court exceeded the

---

[51] *Overstock.com, Inc. v. SmartBargains, Inc.*, 2008 UT 55, ¶ 20, 192 P.3d 858.

[52] *Crossland Sav. v. Hatch*, 877 P.2d 1241, 1243 (Utah 1994) (internal quotation marks omitted).

limits of reasonability in ruling on a rule 56(f) motion, including the following: (1) whether the discovery sought in the party's rule 56(f) affidavit "will uncover disputed material facts that will prevent the grant of summary judgment" or whether the request is merely a "fishing expedition," (2) whether the party opposing summary judgment "has had adequate time to conduct discovery and has been conscientious in pursuing such discovery," and (3) whether the moving party has been diligent in responding to discovery requests by the opposing party.[53]

¶57 The first *Overstock.com, Inc.* factor allows us to consider whether the discovery requested in a rule 56(f) motion is merely a "fishing expedition" or will instead produce material facts that will prevent summary judgment. Mr. Menzies argues that further discovery might lead various witnesses to make admissions favorable to his case. First, he argues that prosecutors might admit that Mr. Britton, the jail inmate who testified against Mr. Menzies at the preliminary hearing, was mentally ill and that they knew Mr. Larrabee saw only a side profile of the man's face while at Storm Mountain. Second, he suggests that Detective Judd might admit that (1) he created the composite photo using Mr. Menzies's mug shot, (2) the police told Mr. Larrabee before the lineup that the man he earlier identified was in custody, (3) the police placed Mrs. Hunsaker's identification cards in the laundry hamper, and (4) the police searched Mr. Menzies's home illegally. Finally, he suggests that Ms. Wells might admit that she (1) did not interview Mr. Larrabee and Ms. Brown, and was not aware that the two were engaged in sexual activity while at Storm Mountain, (2) failed to tell Mr. Menzies about the strength of the State's evidence against him, (3) failed to discuss trial strategy alternatives with Mr. Menzies, (4) did not seek Mr. Menzies's help in creating a viable defense theory, and (5) failed to consider Mr. Denter's involvement in the case.

¶58 The evidence that Mr. Menzies suggests he might obtain is either unnecessary, speculative, or duplicative. He offers no rational explanation for why he thinks the proposed deponents might admit to the allegations he suggests. While it is possible these people might make favorable admissions, it is far more likely that they might stick to their trial testimony, which in no way supports his claims.

---

[53] 2008 UT 55, ¶ 21 (internal quotation marks omitted).

¶59 For instance, Mr. Menzies provides no basis for assuming that the prosecutors in his case would testify that they withheld evidence of Mr. Britton's mental illness. Moreover, even if the prosecutors did admit to the allegations, their testimony would be irrelevant for purposes of proving ineffective assistance because, as we note below, Mr. Menzies has not shown that his trial counsel could have reasonably learned of Mr. Britton's mental illness.[54] And finally, as the PCC noted, any claim based on the testimony would likely be procedurally barred because it could have been brought on direct appeal.

¶60 We have already addressed Mr. Menzies's request to depose Detective Judd.[55] As we note above, Mr. Menzies provides no reason why Detective Judd would make the damning admissions that Mr. Menzies suggests. Faced with bald allegations against Detective Judd, the PCC found it was "not reasonably likely" that he would testify as Mr. Menzies suggests and admit that he lied at trial. For many of the same reasons, the PCC properly denied Mr. Menzies's request to once again depose Ms. Wells.[56] Mr. Menzies provides no evidence to support his assertion that Ms. Wells will change her testimony if a second deposition were conducted. Furthermore, much of what Mr. Menzies suggests he might obtain from a second deposition was already before the PCC from Mr. Menzies's own affidavit, and since the State did not contest his affidavit for purposes of summary judgment, it would have been unnecessarily redundant to depose Ms. Wells a second time.

¶61 In any case, Mr. Menzies has failed to show that these "discovery requests[,] . . . if answered, would affect the outcome of the summary judgment motion."[57] Simply wishing to obtain relevant facts is not enough to justify a rule 56(f) motion and Mr. Menzies does not explain how his requested discovery would

---

[54] *Infra* ¶¶ 131–38.

[55] *Supra* ¶ 41.

[56] *Supra* ¶ 42.

[57] *Overstock.com, Inc.*, 2008 UT 55, ¶ 26; *see also Salt Lake Cnty. v. W. Dairymen Coop., Inc.*, 2002 UT 39, ¶ 24, 48 P.3d 910 (holding that the district court should have granted a rule 56(f) motion because the motion "requested an opportunity to continue with factual exploration on an issue that could have defeated . . . summary judgment").

produce material facts that could defeat the State's summary judgment motion.[58] Accordingly, we cannot conclude based on this first *Overstock.com, Inc.* factor that it was unreasonable for the PCC to deny a rule 56(f) continuance.

¶62 Under the second *Overstock.com, Inc.* factor, we look to whether the party opposing summary judgment has had adequate discovery time and has been diligent in performing discovery. While there is no bright-line test for determining whether a court abused its discretion in ruling on a rule 56(f) motion, our case law suggests that where the party seeking a continuance is dilatory, it is unlikely we will reverse a denial of a rule 56(f) motion.[59] Here, there is no question that Mr. Menzies and his counsel have diligently pursued discovery. In fact, the PCC specifically recognized counsel's diligent pursuit of discovery.

¶63 But diligently pursuing discovery does not foreclose the possibility that a court may reasonably exercise its discretion and deny a rule 56(f) continuance motion. Here the PCC noted that both parties in this case had ample time to conduct discovery. In fact, Mr. Menzies had approximately five years after our decision in *Menzies III* to conduct investigation and discovery. His current lead counsel filed a proposed case management order on January 20, 2010, that suggested a July 31, 2010 deadline to complete discovery. The PCC extended the discovery period almost two

---

[58] Mr. Menzies cites *Tiffany Fine Arts, Inc. v. United States*, 469 U.S. 310, 321 (1985), for the proposition that "seeking relevant information can never be considered a 'fishing expedition.'" The case does not stand for that proposition in the context of a rule 56(f) motion. Instead, the case concerned the Internal Revenue Service's (IRS) summons power. In addressing legislative history that expressed concern over whether the IRS might use its summons power for fishing expeditions, the Court stated that "the IRS is not engaged in a 'fishing expedition' when it seeks information relevant to a legitimate investigation of a particular taxpayer." *Id.* That reasoning is inapplicable to the case before us.

[59] *See, e.g., W. Dairymen Coop., Inc.*, 2002 UT 39, ¶¶ 28–29 (holding that the district court abused its discretion in denying a rule 56(f) motion where the party seeking a continuance was not dilatory); *Crossland Sav.*, 877 P.2d at 1243 (holding that the district court did not abuse its discretion in denying a rule 56(f) motion where the "district court could have concluded" that the party seeking a continuance was dilatory).

and one-half months, and closed discovery on September 29, 2010. The PCC noted that during the extended discovery period Mr. Menzies did not conduct any additional discovery. And as the State pointed out at oral argument, the PCC allowed Mr. Menzies to take depositions even after discovery closed. The court has paid Mr. Menzies's current post-conviction counsel over $194,000 and authorized over $60,000 in litigation expenses. These amounts far exceed the current PCRA's presumptive limits of $60,000 for attorney fees and $20,000 for litigation costs.[60]

¶64  Mr. Menzies argues that the busy schedule of his current lead counsel has not allowed that counsel to adequately investigate this case's voluminous record. Although this is an important consideration, the PCC appears justified in concluding that "[t]his court is simply ruling that such work has been effective and cannot go on without end." We have previously sanctioned denials of rule 56(f) motions where the discovery period was much shorter than here.[61] We recognize that the record is likely more extensive than the record in other cases where we have found the discovery time period sufficient, but we cannot say that the PCC unreasonably concluded that Mr. Menzies has had adequate time and resources to conduct discovery.

¶65 Finally, under the third *Overstock.com, Inc.* factor we consider whether the moving party has been diligent in responding to discovery requests. We find nothing in the record that suggests the State has not been diligent in responding to Mr. Menzies's discovery requests. The only indication suggesting otherwise is a request for discovery sanctions filed by Mr. Menzies. But the PCC denied that request as untimely because Mr. Menzies challenged the State's responses to certain discovery inquiries as inadequate almost a year after receiving the responses. Additionally, the PCC noted that the State's responses

---

[60] UTAH CODE § 78B-9-202(3).

[61] *See Crossland Sav.*, 877 P.2d at 1243 (affirming a denial of a rule 56(f) motion where the discovery period was approximately four months); *Hunt v. Hurst*, 785 P.2d 414, 416 (Utah 1990) (affirming a denial of a rule 56(f) motion where the discovery period was approximately eight months (including a five-month extension)). *Contra W. Dairymen Coop., Inc.*, 2002 UT 39, ¶ 29 (reversing a denial of a rule 56(f) motion where the discovery period was approximately two months).

could not be considered inadequate merely because the State's references to the record did not include pinpoint record citations. The State's diligence in responding to discovery requests weighs in favor of concluding that the PCC did not abuse its discretion.

¶66 In sum, the first and third *Overstock.com, Inc.* factors weigh in favor of concluding that the PCC reasonably denied a continuance. The second factor likely weighs in favor of neither party, and in any event does not favor Mr. Menzies significantly enough for us to hold that the PCC abused its discretion. Accordingly, we conclude that the PCC did not abuse its discretion in denying Mr. Menzies's request for a rule 56(f) continuance.

2. The PCC Did not Abuse Its Discretion in Denying Mr. Menzies an Evidentiary Hearing Before Ruling on the Cross-Motions for Summary Judgment

¶67 The PCC also did not abuse its discretion in declining to hold an evidentiary hearing before ruling on the cross-motions for summary judgment. Mr. Menzies argues that the PCC should have granted his motion for an evidentiary hearing under rule 43(b) of the Utah Rules of Civil Procedure before issuing its summary judgment order, but in reality his motion was merely a regurgitation of his previous motions for a rule 56(f) continuance.

¶68 Rule 43(b) states that

> [w]hen a motion is based on facts not appearing of record the court may hear the matter on affidavits presented by the respective parties, but the court may direct that the matter be heard wholly or partly on oral testimony or depositions.

Mr. Menzies reads rule 43(b) to require a court to hold an evidentiary hearing before granting summary judgment, and argues that it is an abuse of discretion for a court to deny such a hearing unless "the findings of fact, verdict, or sentence go unchallenged." Furthermore, he argues that it is an abuse of discretion to deny an evidentiary hearing where the affidavits on their face suggest *Strickland* prejudice to any degree. To support his argument, Mr. Menzies cites *Karis v. Calderon*[62] and *Ross v. State*,[63] both of which he misreads.[64]

---

[62] 283 F.3d 1117 (9th Cir. 2002).

[63] 2012 UT 93, 293 P.3d 345.

¶69 At bottom, rule 43(b) does not require courts to grant an evidentiary hearing simply because a petitioner's affidavits suggest that certain deponents may potentially offer favorable testimony. If the affidavits themselves do not raise a genuine issue of material fact, as they did not here, a court does not abuse its discretion in denying further discovery and evidentiary hearings. As noted by the PCC, a court's concern under rule 43(b) is whether the "voluminous record, despite the claims of insufficient discovery [in the petitioner's rule 43(b) motion], present th[e] court with enough facts that the court is able to decide the cross motions for summary judgment without further discovery, affidavits, or an evidentiary hearing."

---

[64] Mr. Menzies cites *Ross* for the proposition that "[w]here unopposed facts are presented by affidavit which suggest *Strickland* prejudice, a court abuses its discretion when it grants summary judgment without first holding an evidentiary hearing." This misstates *Ross*'s holding. *Ross* reiterated the well-established rule that "genuine issues of material fact preclude summary judgment." *Id.* ¶ 51. In *Ross*, we reversed a grant of summary judgment because the record was ambiguous regarding counsel's actions, and so, we could not conclude whether counsel's action were objectively unreasonable. *Id.* Nothing in our opinion requires a court to delay deciding a motion for summary judgment simply because the petitioner asks for an evidentiary hearing. And our decision in no way *mandates* that courts grant evidentiary hearings before ruling on a motion for summary judgment.

Furthermore, the *Karis* case from the Ninth Circuit actually *supports* our conclusion. The court concluded in that case that the district court did not abuse its discretion in denying a habeas petitioner an evidentiary hearing because "even assuming [the petitioner's] allegations to be true, they do not entitle him to habeas relief." 283 F.3d at 1127. Here, the PCC declined to hold an evidentiary hearing for the same reason. That is, it concluded that none of the evidence Mr. Menzies suggested which might be derived from holding an evidentiary hearing would raise a genuine issue of material fact. *Karis* simply does not support Mr. Menzies's argument that "the only basis for denying an evidentiary hearing is if the findings of fact, verdict, or sentence go unchallenged."

Opinion of the Court

¶70 The PCC denied Mr. Menzies's rule 43(b) motion, recognizing that his requests would not have raised any genuine issue of material fact. It concluded that much of the information Mr. Menzies suggested might be obtained from the hearing would be unnecessary, speculative, or duplicative. We agree with the PCC. Much of the information Mr. Menzies sought overlapped with his repeated discovery requests under rule 56(f) that we address above—none of which would have raised a genuine issue of material fact.[65] For this reason, the PCC concluded that the information he sought at an evidentiary hearing would not "impact what trial counsel did at the time and what trial counsel did not do." Because Mr. Menzies's discovery requests were either unnecessary, speculative, or duplicative, the PCC did not abuse its discretion in declining to hold an evidentiary hearing.

### III. Mr. Menzies Did not Receive Ineffective Assistance of Counsel During the Guilt-Phase, Penalty-Phase, or Appellate Proceedings

¶71 The Sixth Amendment to the United States Constitution provides a criminal defendant "the right . . . to have the Assistance of Counsel for his defence."[66] A corollary is that "the right to counsel is the right to the effective assistance of counsel."[67]

¶72 Mr. Menzies argues that he received ineffective assistance of counsel both at trial and on appeal. The PCRA allows a post-conviction petitioner to raise ineffective assistance claims where the petitioner had the same counsel at both trial and on appeal.[68] That is the situation here. Because LDA represented Mr. Menzies

---

[65] *Supra* ¶¶ 55–66.

[66] U.S. CONST. amend. VI.

[67] *Strickland v. Washington*, 466 U.S. 668, 686 (1984) (internal quotation marks omitted); *Lafferty v. State*, 2007 UT 73, ¶ 11, 175 P.3d 530 ("Implicit in the Sixth Amendment's guarantee of counsel is the right to effective assistance of counsel.").

[68] UTAH CODE § 78B-9-104(1)(d) ("Unless precluded by Section 78B-9-106 or 78B-9-107, a person . . . may file an action . . . for post-conviction relief [on the] grounds [that] . . . the petitioner had ineffective assistance of counsel in violation of the United States Constitution or Utah Constitution.").

at trial and on appeal, his ineffective assistance claims, except for two,[69] are properly before us.

¶73 In his Fifth Amended Petition, Mr. Menzies raised approximately twenty ineffective assistance of counsel claims, some of which contained numerous subparts. The PCC granted summary judgment for the State and ordered that Mr. Menzies's Fifth Amended Petition be dismissed. Mr. Menzies appeals the PCC's decision on ten claims and argues that his counsel: (1) failed to use an adequate defense theory, (2) failed to properly impeach testimony from one of Mr. Menzies's fellow inmates, Mr. Britton, (3) inadequately investigated Mr. Larrabee and Ms. Brown's eyewitness testimony and failed to move to suppress their testimony, (4) created a conflict of interest by having him sign a liability waiver, (5) were inadequately qualified and prepared for penalty-phase proceedings, (6) failed to conduct an adequate penalty-phase investigation, (7) failed to present adequate mitigating evidence, (8) hid evidence of trial counsel's errors and Mr. Menzies's alleged organic brain damage, (9) failed to conduct an appellate investigation, and (10) failed to object to the jury instruction regarding the "beyond a reasonable doubt" standard.

---

[69] Mr. Menzies raises two claims for the first time on appeal, both of which we decline to reach as unpreserved. First, he argues that trial and appellate counsel were ineffective in failing to raise a due process claim based on the fact that the jury prejudicially saw him in handcuffs. The PCC agreed with the State that because the claim was not raised in Mr. Menzies's Fifth Amended Petition, it was procedurally barred. We agree with the PCC that the claim is unpreserved and decline to reach it on appeal because Mr. Menzies does not argue that either exceptional circumstances or plain error justify review. *See Kell v. State*, 2012 UT 25, ¶ 36, 285 P.3d 1133 ("[T]he preservation rule applies to every claim, including constitutional questions, unless a defendant can demonstrate that exceptional circumstances exist or plain error occurred." (internal quotation marks omitted)). Second, Mr. Menzies argues that trial counsel should have advised him of the option to plead guilty under *North Carolina v. Alford*, 400 U.S. 25 (1970). We decline to reach this claim as well, for the same reasons–it is unpreserved, and Mr. Menzies does not argue that either exceptional circumstances or plain error justify review. *See Kell*, 2012 UT 25, ¶ 36.

¶74  We affirm the PCC's decision granting the State summary judgment on each of these claims because, even accepting Mr. Menzies's version of the facts, he is unable to raise a genuine issue of material fact showing that his counsel's performance was deficient and prejudiced his case.

¶75 Each of Mr. Menzies's ineffective assistance claims is governed by the two-part test set forth in *Strickland v. Washington*, which requires the defendant to show (1) "that counsel's performance was deficient" and (2) that "the deficient performance prejudiced the defense."[70] In *Archuleta v. Galetka*, we noted that our case law has restated *Strickland* as follows: "[t]o prevail, a defendant must show, first, that his counsel rendered a deficient performance in some demonstrable manner, which performance fell below an objective standard of reasonable professional judgment and, second, that counsel's performance prejudiced the defendant."[71]

¶76  The first prong of *Strickland* requires Mr. Menzies to show "that counsel's performance was deficient."[72] In essence, the inquiry into counsel's performance should focus on "whether counsel's assistance was reasonable considering all the circumstances."[73] We "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance."[74] This presumption is only overcome by a demonstration "that the challenged actions cannot be considered sound strategy under the circumstances."[75] Importantly, in assessing whether counsel's performance was deficient, we must look at the facts and law available to counsel at the time of the representation.[76]

---

[70] 466 U.S. at 687.

[71] 2011 UT 73, ¶ 38, 267 P.3d 232, *cert. denied*, 133 S. Ct. 112 (2012) (internal quotation marks omitted).

[72] *Strickland*, 466 U.S. at 687.

[73] *Id.* at 688.

[74] *Id.* at 689.

[75] *Menzies III*, 2006 UT 81, ¶ 89, 150 P.3d 480.

[76] *See Cullen v. Pinholster*, 131 S. Ct. 1388, 1407 (2011) (analyzing counsel's performance under "the standard of professional competence in capital cases that prevailed in Los Angeles in 1984"); *State v. Dunn*, 850 P.2d 1201, 1228 (Utah 1993) ("To

(continued)

¶77 In addition to deficient performance, *Strickland* requires that "any deficiencies in counsel's performance must be prejudicial to the defense."[77] The defendant generally has the obligation to affirmatively prove prejudice and "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."[78] Because the exact formulation of the prejudice standard differs depending on which phase of the proceedings is at issue, we describe the relevant prejudice standard at each of the guilt-phase, penalty-phase, and appellate proceedings below.

¶78 A satisfactory showing of both parts of the *Strickland* test is required for the defendant to prevail.[79] "As a result, it is not necessary for us to address both components of the inquiry if we determine that a defendant has made an insufficient showing on one."[80] Each of Mr. Menzies's ineffective assistance challenges is treated separately below using the *Strickland* framework.

¶79 Before examining the merits of Mr. Menzies's ineffective assistance claims, we briefly address two issues that impact each of his claims. First, we discuss how the procedural posture of this case affects our analysis of Mr. Menzies's ineffective assistance claims. Second, we describe the relevance of the American Bar Association (ABA) Standards and other professional standards that Mr. Menzies relies on.

---

establish a claim of ineffectiveness based on an oversight or misreading of law, a defendant bears the burden of demonstrating why, on the *basis of the law in effect at the time of trial*, his or her trial counsel's performance was deficient."(emphasis added)).

[77] *Strickland*, 466 U.S. at 692.

[78] *Id.* at 694.

[79] *See Parsons v. Barnes*, 871 P.2d 516, 522 (Utah 1994) (requiring defendants to "affirmatively prove both prongs of the *Strickland* test to prevail").

[80] *Archuleta*, 2011 UT 73, ¶ 41 (internal quotation marks omitted).

Opinion of the Court

*A. The Effect of the Summary Judgment Standard and Prevailing Professional Norms on Mr. Menzies's Ineffective Assistance Claims*

1. The Summary Judgment Standard

¶80 Before the PCC, both parties filed motions for summary judgment, and each argued that it is entitled to judgment as a matter of law and that there are no genuine issues of material fact.[81] Each party has also opposed the other party's motion for summary judgment and argued that there are many factual disputes.[82] The PCC rejected Mr. Menzies's ineffective assistance claims and granted the State's motion for summary judgment.

¶81 "The determination of which party must come forward with evidence proving that there is a genuine material dispute of fact depends on which party bears the burden of proof on the underlying legal theory or claim that is the subject of the summary judgment motion."[83] Here, Mr. Menzies bears the burden of proving his underlying legal claims of ineffective assistance of counsel. Accordingly, with respect to the State's motion for summary judgment, the State bears the initial burden of showing that it "is entitled to judgment and that there is no genuine issue of material fact that would preclude summary judgment in [its] favor."[84] Once the State makes that showing, the burden of proof then shifts to the nonmoving party, here Mr. Menzies. And because Mr. Menzies bears the burden of proving ineffective assistance, he "cannot rest on [his] allegations alone, particularly when the parties had an opportunity to

---

[81] It is settled law that "[c]ross-motions for summary judgment do not ipso facto dissipate factual issues, even though both parties contend for the purposes of their motions that they are entitled to prevail because there are no material issues of fact." *Amjacs Interwest, Inc. v. Design Assocs.*, 635 P.2d 53, 55 (Utah 1981).

[82] We note that for purposes of its own summary judgment motion the State accepted all of Mr. Menzies's factual allegations to the extent they did not conflict with the existing record.

[83] *Jones & Trevor Mktg., Inc. v. Lowry*, 2012 UT 39, ¶ 30, 284 P.3d 630.

[84] *Id.* ¶ 29.

conduct discovery."[85] Instead, he "must set forth specific facts showing that there is a genuine issue for trial."[86]

¶82 With this background, we next address the relevance of ABA and other professional standards in analyzing Mr. Menzies's ineffective assistance claims.

2. Professional Standards

¶83 Several of Mr. Menzies's ineffective assistance arguments rely on ABA standards and National Legal Aid and Defense Association (NLADA) standards. We address his specific arguments regarding these standards in our analysis of his ineffective assistance claims. It is helpful at the outset, however, to note the weight we give such standards in conducting our *Strickland* analysis.

¶84 *Strickland* recognized that ABA standards and other practice norms "are guides to determining what is reasonable."[87] But such standards and norms are "only guides" and "[n]o particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant."[88]

¶85 In *Menzies III*, we addressed Mr. Menzies's ineffective assistance claims regarding his former post-conviction counsel, Edward Brass, by consulting the 2003 version of the ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases. There it was clear that Mr. Brass "went far beyond" failing to comply with ABA standards.[89] For instance, Guideline 10.15.1(E)(4) requires counsel to "continue an aggressive investigation of all aspects of the case." Mr. Brass's conduct fell well below this standard because he provided

---

[85] *Id.* ¶ 30 (internal quotation marks omitted).

[86] *Id.* (internal quotation marks omitted).

[87] *Strickland*, 466 U.S. at 688.

[88] *Id.* at 688–89; *Menzies III*, 2006 UT 81, ¶ 90 (noting that "we rely on the ABA Death Penalty Guidelines to the extent they are relevant to our decision").

[89] *Menzies III*, 2006 UT 81, ¶ 94.

"virtually no representation and willfully disregarded nearly every aspect of Menzies' case."[90]

¶86 More recently, in *Archuleta*, we reaffirmed the relevance of ABA standards in conducting our *Strickland* analysis. There the petitioner relied on the 1989 version of the ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases. We stated that the "United States Supreme Court has on multiple occasions indicated that the ABA Guidelines extant at the time of challenged attorney performance form the baseline for what constitutes reasonable investigation."[91]

¶87 We have also indicated, however, that noncompliance with ABA guidelines does not automatically establish ineffective assistance. In *Lafferty v. State*,[92] the petitioner grounded his post-conviction ineffective assistance claim on trial counsel's alleged noncompliance with ABA guidelines. We rejected the claim and stated that "noncompliance with the ABA guidelines is not, by itself, grounds for reversal."[93]

¶88 Mr. Menzies relies on several different guidelines in his briefs, including (1) the 1979 ABA Standards for the Defense Function, (2) the 1987 NLADA Standards for Performance of Counsel in Death Penalty Cases, (3) the 1989 and 2003 ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases, (4) the ABA Model Rules of Professional Conduct and commentary on those rules, and (5) the Utah Rules of Professional Conduct and Utah State Bar ethics advisory opinions applying those rules. Where Mr. Menzies relies on standards that would have been available to counsel we give them appropriate weight. But neither the 2003 nor the 2010 guidelines relied on by Mr. Menzies would have been available to either trial

---

[90] *Id.*

[91] *Archuleta*, 2011 UT 73, ¶ 121 n.10; *see also Wiggins v. Smith*, 539 U.S. 510, 524 (2003) ("Counsel's conduct similarly fell short of the standards for capital defense work articulated by the American Bar Association (ABA)-standards to which we long have referred as 'guides to determining what is reasonable.'" (quoting *Strickland*, 466 U.S. at 688)).

[92] 2007 UT 73.

[93] *Id.* ¶ 55.

or appellate counsel. Consequently, we give little weight to the arguments made by Mr. Menzies that rely on those standards.[94]

¶89 Below we address each of Mr. Menzies's ineffective assistance claims as they relate to counsel's performance during the guilt-phase, penalty-phase, and appellate proceedings.

### B.  Mr. Menzies Has not Raised a Genuine Issue of Material Fact Regarding Trial Counsel's Guilt-Phase Representation

¶90 Mr. Menzies raises four ineffective assistance claims regarding trial counsel's guilt-phase representation. He argues that his trial counsel (1) erroneously pursued a failure-of-proof defense instead of a mental illness defense theory; (2) failed to properly impeach testimony from one of Mr. Menzies's fellow jail inmates, Mr. Britton, concerning an alleged confession by Mr. Menzies; (3) failed to elicit the specific reason that Mr. Larrabee and Ms. Brown were distracted at the time they allegedly saw Mr. Menzies at the scene of the crime, and unreasonably choose to impeach Mr. Larrabee's and Ms. Brown's identification evidence rather than seek suppression of it; and (4) denied Mr. Menzies his right to conflict-free counsel by having him sign a liability waiver.

¶91 The *Strickland* two-part test governs claims of ineffectiveness regarding counsel's guilt-phase representation. The prejudice standard in the context of a guilt-phase ineffective assistance claim requires Mr. Menzies to show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome."[95] Further, "[i]t is not enough to show

---

[94] *See Archuleta*, 2011 UT 73, ¶ 121 n.10 ("[T]he ABA Guidelines extant at the time of challenged attorney performance form the baseline for what constitutes reasonable investigation."). Mr. Menzies cites *Rompilla v. Beard*, 545 U.S. 374 (2005), for the proposition that courts may apply guidelines not in circulation at the time of the counsel's challenged conduct. *Rompilla* does not stand for this proposition. There the Supreme Court consulted two versions of an ABA standard, one that existed at the time of trial and one that did not. *Id.* at 387 n.6. The court noted, however, that there was "no material difference between" the two. *Id.* at 387 n.6.

[95] *Strickland*, 466 U.S. at 694.

that the errors had some conceivable effect on the outcome of the proceeding."[96] Instead, "[t]he likelihood of a different result must be substantial, not just conceivable."[97]

¶92 For the reasons explained below, we affirm the PCC's ruling and hold that Mr. Menzies has not raised a genuine issue of material fact as to either part of the *Strickland* test concerning trial counsel's guilt-phase representation.

1. Trial Counsel's Decision to Use a Failure-of-Proof Defense Rather than a Mental Illness Defense Was not Unreasonable, and Mr. Menzies Has not Shown Prejudice

¶93 Mr. Menzies first argues that trial counsel unreasonably pursued a failure-of-proof defense rather than a mental illness defense. More specifically, he argues that trial counsel could have asserted a diminished mental capacity defense and that this defense would have resulted in a reduction of his conviction to second degree murder. In addition, Mr. Menzies argues that he could have alternatively pled "guilty and mentally ill" under Utah Code section 77-35-21.5 (Supp. 1983).

¶94 We affirm. In light of the weaknesses in the State's case and Mr. Menzies's insistence that he did not commit the murder, Mr. Menzies fails to raise any genuine issue of material fact concerning counsel's investigation and defense strategy and also fails to establish prejudice. Before addressing the specifics of Mr. Menzies's claim, we recite some additional facts to give context to our analysis.

a. Additional facts relevant to trial counsel's defense strategy

¶95 Trial counsel's failure-of-proof defense strategy consisted of two parts. First, trial counsel argued that the State failed to meet its burden to prove that Mr. Menzies killed Mrs. Hunsaker. Second, and in the alternative, trial counsel argued that the State failed to prove the existence of an aggravator that would support a capital homicide conviction.

¶96 Before trial, counsel arranged for two different psychological assessments of Mr. Menzies. They first asked clinical psychologist Michael D. DeCaria to evaluate him. In the relevant portion of his report, Dr. DeCaria stated as follows:

---

[96] *Harrington v. Richter*, 131 S. Ct. 770, 787 (2011) (internal quotation marks omitted).

[97] *Id.* at 792.

> It is possible that Mrs. Hunsaker did something unwittingly and as innocent as a facial expression or a word or a gesture which stimulated Mr. Menzies' mental illness in the guise of a brief, reactive psychosis during the course of which he took her life. This scenario becomes even more plausible if Mr. Menzies' assertion that he had been using cocaine in the day or days prior to the incident is true.

Mr. Menzies interprets Dr. DeCaria's report to mean that "a 'brief, reactive psychosis' . . . caused him to forget killing Hunsaker." Trial counsel did not attempt to use Dr. DeCaria or his report during guilt-phase proceedings. Counsel did, however, use Dr. DeCaria during penalty-phase proceedings.

¶97 Second, trial counsel asked Dr. Alan Jeppsen to evaluate Mr. Menzies. Dr. Jeppsen's report describes Mr. Menzies's "history of hostility and other negative aspects," including "that he had a history of alcohol and drug abuse, and that he was explosive and impulsive and could be expected to act out in the future." Dr. Jeppsen diagnosed Mr. Menzies with the following conditions: "(1) major depression with psychotic features manifested by paranoid thinking and hallucinations, (2) history of alcohol and drug abuse, [and] (3) past history of attention deficit disorder." Mr. Menzies's claims in his brief that "Jeppsen also reported extreme mental illness," but nothing in Dr. Jeppsen's report specifically makes that conclusion. As with Dr. DeCaria, trial counsel did not call Dr. Jeppsen as a witness during guilt-phase proceedings.

¶98 Mr. Menzies points to several other pieces of evidence to show that trial counsel did not thoroughly investigate the possibility of a mental illness defense. First, in a recent affidavit, Mr. Menzies states that trial counsel never discussed the mental illness defense with him. Second, Mr. Menzies cites a neuropsychological evaluation given by Tim Kockler on September 20, 2010. In his evaluation, Dr. Kockler diagnosed Mr. Menzies with multiple cognitive disorders and concluded that Mr. Menzies "suffered from a neurological/psychiatric condition[] at the time of the murder, and most likely impaired his capacity to form a required mental state; however, I understand this is a legal decision to be made by the factfinder." Mr. Menzies also relies on an affidavit obtained from trial co-counsel Ms. Palacios obtained on October 5, 2010. In her affidavit, Ms. Palacios states as follows:

Based upon the report by Dr. Michael DeCaria, Mr. Menzies may have suffered a psychotic break during the course of the murder. LDA could have presented either a diminished capacity, or mental illness defense at trial. I believe that a jury could have determined that because of Mr. Menzies's mental illness, that he would have been found guilty of a lesser included offense of aggravated murder.

Mr. Menzies argues that this affidavit "admits *Strickland* prejudice."

¶99 Mr. Menzies suggests that he would have considered using a mental illness defense had trial counsel adequately discussed the option with him. In an affidavit given July 20, 2011, Mr. Menzies stated that: "[a]lthough I desired to proceed to trial, and maintained my innocence throughout the trial and direct appeal process, I would have been open to discussing all available defenses with trial counsel, and would have, of course, wanted to know the probabilities of succeeding with all viable defenses, based upon the State's evidence, and based upon the fact uncovered by my attorneys' investigation."

¶100 With this additional background in place, we examine the merits of Mr. Menzies's claim in the context of the *Strickland* two-part test.

b. Mr. Menzies has not met his burden of showing that trial counsel's decision to use a failure-of-proof defense prejudiced his case

¶101 Mr. Menzies's claim fails because he has not met his burden of establishing prejudice. Part of his prejudice argument relies on conclusory assertions like "[i]t is *Strickland* prejudice to fail to present a mental illness defense in a capital case if the defense is available." These assertions are plainly insufficient to show that if trial counsel had used a mental illness defense there is a substantial likelihood the result in his case would have been different. In fact, Mr. Menzies does not even claim that he would have agreed to use a mental illness defense if adequately advised. He only claims that he would have *considered* using a mental illness defense. Mr. Menzies's assertion that he would have *considered* using a mental illness defense falls far short of the

prejudice burden he bears of showing that "[t]he likelihood of a different result [was] substantial, not just conceivable."[98]

¶102 Further, Mr. Menzies has not refuted the State's argument that trial counsel's use of a mental illness defense would have "corroborated what the circumstantial evidence showed: Menzies killed Maurine." By using a mental illness defense, Mr. Menzies would have at least had to tacitly admit that he killed Mrs. Hunsaker. And all along Mr. Menzies has maintained that he was not at Storm Mountain and did not kill Mrs. Hunsaker.

¶103 Mr. Menzies's primary argument regarding prejudice is that trial counsel "could have gotten a second degree murder conviction by using" the defense of diminished mental capacity or by having him plead guilty but mentally ill under section 77-35-21.5. Neither argument has merit.

¶104 First, pleading guilty but mentally ill would have had no effect on the outcome of this case. This is because the statute providing for a plea of guilty but mentally ill expressly states that the plea does not alter the defendant's sentence.[99] Mr. Menzies has thus failed to raise a genuine issue of material fact concerning prejudice, since the court could still have imposed the death penalty under the plea statute.

¶105 Second, Mr. Menzies incorrectly asserts that counsel could have obtained a lesser conviction by using a diminished mental capacity defense. We held in *State v. Sessions* that a defendant could successfully assert a defense of diminished mental capacity where the defendant suffered from "a mental disease or defect, not amounting to legal insanity, that impairs a defendant's ability to form the specific intent necessary to prove certain crimes."[100] We noted in *Sessions* that diminished mental capacity differed from the statutory mental illness defense in that diminished mental capacity was not a complete defense because it generally did not absolve the defendant "from all criminal

---

[98] *Harrington*, 131 S. Ct. at 792.

[99] UTAH CODE § 77-35-21.5(3) (Supp. 1983) ("If the defendant is found guilty and mentally ill, the court shall impose any sentence which could be imposed pursuant to law upon a defendant who is convicted of the same offense.").

[100] 645 P.2d 643, 644 (Utah 1982).

liability."[101] The diminished capacity defense was typically used "in homicide cases to reduce first degree murder to second degree murder or manslaughter."[102]

¶106 Mr. Menzies suggests that this defense would have been available to him even if trial counsel could not show that a mental illness impaired his ability to form the requisite mens rea. In contrast, the State argues that "when Menzies murdered Maurine, diminished mental capacity would have applied as a defense only if a mental illness prevented Menzies from understanding that he was killing a person." We agree with the State on this point. Under *Sessions*, to successfully assert diminished mental capacity, trial counsel would have had to show that Mr. Menzies had a mental disease or defect that impaired his ability to form the specific intent necessary to be convicted of first degree homicide.[103] In other words, Mr. Menzies would have had to assert that his mental illness impaired his ability to "intentionally or knowingly" kill Mrs. Hunsaker.[104] Mr. Menzies is simply incorrect in asserting that trial counsel could have successfully used the defense even if they could not show that Mr. Menzies suffered from a mental illness that negated his ability to form the necessary mens rea.

¶107 Mr. Menzies's statement that he would have *considered* using a mental illness defense is insufficient to establish a genuine issue of material fact regarding the prejudice prong of *Strickland*. Further, his argument that counsel could have obtained a lesser

---

[101] *Id.* at 645.

[102] *Id.* at 644.

[103] *Id.*; *see also State v. Herrera*, 895 P.2d 359, 362 (Utah 1995) (discussing the 1983 amendments to the statutory mental illness defense and noting that "[t]he new law limits the defense to simply that the defendant did not have the requisite mens rea of the alleged crime. . . . The new law does away with the traditional affirmative insanity defense that the killing was perceived to be justifiable and therefore done with innocent intent."); *State v. Wood*, 648 P.2d 71, 88 n.18 (Utah 1982) (noting that diminished mental capacity "may also be a partial defense in the guilt phase of a capital case in the sense that, if it negates a necessary specific intent, the crime would be reduced in degree to second degree murder").

[104] UTAH CODE § 76-5-202(1) (Supp. 1983).

charge of second degree murder by using the defense of diminished mental capacity fails to demonstrate prejudice because he overlooks the fact that the defense required proof that a mental illness impaired a defendant's ability to form the necessary mens rea. Moreover, his argument that counsel could have obtained a second degree murder conviction by having him plead guilty but mentally ill is insufficient to show prejudice because the applicable statute expressly states that such a plea does not alter a defendant's sentence. For these reasons we affirm the PCC's ruling that Mr. Menzies failed to raise a genuine issue of material fact concerning *Strickland* prejudice.

    c.  Trial counsel did not render deficient performance because their investigation and strategy was reasonable given Mr. Menzies's claim of innocence, the weaknesses in the case against him, and the lack of evidence suggesting he was mentally ill

¶108 Even if we were to conclude that Mr. Menzies satisfied his burden of showing prejudice, we would still affirm the PCC's ruling since trial counsel conducted an adequate mental illness investigation and reasonably chose to pursue a failure-of-proof strategy. We have stated that an important prevailing professional norm is counsel's "duty to adequately investigate the underlying facts of the case."[105] "This is because investigation sets the foundation for counsel's strategic decisions about how to build the best defense."[106] Trial counsel's performance was not deficient for four principal reasons. First, Mr. Menzies insisted throughout the proceedings that he was innocent. Second, there were weaknesses in the State's case against Mr. Menzies that trial counsel reasonably thought could be exploited. Third, trial counsel could have reasonably concluded based on the available evidence that Mr. Menzies was not mentally ill. And fourth, trial counsel thoroughly investigated Mr. Menzies's case.

¶109 To begin, Mr. Menzies's insistence that he did not commit the murder influenced trial counsel's decision to pursue a failure-of-proof strategy. Mr. Menzies argues that trial counsel should

---

[105] *State v. Lenkart*, 2011 UT 27, ¶ 27, 262 P.3d 1 (internal quotation marks omitted).

[106] *Id.* (internal quotation marks omitted).

have vetoed[107] his claims of innocence and pursued an alternative defense theory, despite our case law to the contrary. In *State v. Wood*, we reasoned that "an attorney acts as an assistant for his client, and not as a master. An attorney who refuses to present such a basic claim as that of innocence acts outside the duties of an attorney, even if the claim of innocence detracts from other defenses presented by counsel."[108] Our reasoning in *Wood* suggests it was not unreasonable for trial counsel to give Mr. Menzies's claim of innocence significant weight in choosing a defense strategy. Additionally, *Strickland* expressly recognized that "[t]he reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions."[109]

¶110 Despite his unwavering insistence throughout the trial that he was innocent, he now argues that counsel should have vetoed his claims of innocence because the evidence, taken as a whole, overwhelmingly suggested that he committed the murder. He argues that, given this evidence, it was per se unreasonable for trial counsel to pursue a failure-of-proof defense. For this proposition, Mr. Menzies relies on a Ninth Circuit case, *Johnson v. Baldwin*,[110] and a Second Circuit case, *DeLuca v. Lord*.[111] But these cases are unpersuasive here. In *Johnson*, the defendant's involvement in the crime was so factually undeniable that "[t]he jury obviously concluded that he was not telling the truth when he denied that he was present at the scene."[112] And in *DeLuca*

---

[107] The State argues that Mr. Menzies has waived any argument that counsel should have vetoed his claims of innocence. But the veto theory advocated by Mr. Menzies is not really a separate claim. Rather, it is instead part-and-parcel of his overall claim that trial counsel should have used a mental illness defense, which is properly before us.

[108] 648 P.2d 71, 91 (Utah 1982); *see State v. Maestas*, 2012 UT 46, ¶ 242, 299 P.3d 892 ("[T]he Sixth Amendment does not mandate that defense counsel present mitigating evidence over the wishes of a represented defendant.").

[109] 466 U.S. at 691.

[110] 114 F.3d 835 (9th Cir. 1997).

[111] 77 F.3d 578 (2d Cir. 1996).

[112] *Johnson*, 114 F.3d at 838–39. We note that in *Johnson*, the Ninth Circuit did not even need to address the deficient

(continued)

counsel failed to pursue an extreme emotional disturbance defense even though "upon a realistic appraisal of the strength of the People's case, and of the other defenses contemplated by [counsel], [an extreme emotional disturbance defense] offered the only realistic escape."[113] Neither situation applies here.

¶111 In contrast to *Johnson*, trial counsel here could have reasonably believed that Mr. Menzies's claim of innocence could be supported. For instance, trial counsel highlighted the timeline of events on the date Mrs. Hunsaker disappeared to show that Mr. Menzies could not have been the person to kidnap her. Specifically, counsel noted that a witness reportedly saw Mrs. Hunsaker at Denny's between 11:00 and 11:30 p.m. with someone other than Mr. Menzies, and that Mr. Menzies arrived at his girlfriend's mother's home, located "some distance" from Denny's, between 11:30 p.m. and midnight. Mr. Menzies spoke on the telephone with three different individuals between 12:10 a.m. and 1:00 a.m., none of whom noted that anything unusual took place on the calls. Additionally, trial counsel noted that Mrs. Hunsaker's neck wound would have forced blood down her body, yet the items found in Mr. Menzies's apartment, such as the parka and handcuffs, had no trace of any blood. Trial counsel pointed out that other individuals used Mr. Denter's car and left belongings in it, suggesting the handcuffs box under the driver's seat may not have been Mr. Menzies's. Further, even if the handcuffs were Mr. Menzies's, the medical examiner's report stated that the marks on Mrs. Hunsaker's hands could have been caused by wire or cord, but made no mention of handcuffs.

¶112 Other circumstantial evidence bolstered Mr. Menzies's claim that he was not with Mrs. Hunsaker, such as the fact that the police found hair on Mrs. Hunsaker's clothes that was not his, his neighbors reported no unusual events at his apartment, and Mr. Larrabee equivocated regarding his identification testimony. In short, the evidence was not, at the time of trial, as clearly unfavorable as Mr. Menzies now suggests. To be sure, a jury could reasonably give little weight to this evidence. But the opposite conclusion is also reasonable. It is not the case here, as it was in *Johnson*, that a claim of innocence was obviously untruthful.

---

performance part of *Strickland* because the State did not challenge the lower court's finding of deficient performance. *Id.* at 838.

[113] *DeLuca*, 77 F.3d at 585.

¶113 *Deluca* is also inapposite to Mr. Menzies's case. Even assuming that the mental illness defense would have been useful in Mr. Menzies's defense, it was not "the only realistic escape." As noted above, there were weaknesses in the case against Mr. Menzies that trial counsel reasonably believed could be exploited using the failure-of-proof defense. The PCC correctly observed that the failure-of-proof theory "was far, far superior and extremely reasonable as to conduct by trial counsel."

¶114 In addition to Mr. Menzies's insistence that he was innocent and the holes in the State's case, trial counsel also faced evidence that they might have reasonably believed would not be sufficient to establish that Mr. Menzies was mentally ill. The psychologists' reports and Ms. Palacios's affidavit do not help establish that there is a genuine issue of material fact regarding trial counsel's performance. Ms. Palacios stated in her affidavit that trial counsel "could have presented either diminished capacity, or mental illness defense at trial." But just because counsel *could* have done so does not mean that using another defense was unreasonable. Further, Dr. Kockler notes in his report that Mr. Menzies suffered from conditions that could have hindered his ability to form the necessary mental state, but this is a conclusory assertion. Nowhere in his report does he specify how those conditions would have affected Mr. Menzies's ability to understand that he was killing a person.

¶115 Dr. DeCaria's report also does not conclusively show that a mental illness impaired Mr. Menzies's ability to form the necessary mens rea. Mr. Menzies suggests that the report indicates that he "may have experienced a psychotic break, and may not have remembered killing Hunsaker." Trial counsel reasonably choose not to pursue a mental illness defense based on that statement, however, because under either the statutory mental illness defense or the diminished mental capacity defense, Mr. Menzies simply forgetting that he killed Mrs. Hunsaker would not have sufficed as a defense. Both defenses require that the defendant's mental illness negate or impair the requisite mens rea of the crime.[114] The first degree murder statute in effect at the

---

[114] *See* UTAH CODE § 76-2-305(1) (Supp. 1983) ("It is a defense to a prosecution under any statute or ordinance that the defendant, as a result of mental illness, lacked the mental state required as an element of the offense charged. Mental illness shall not otherwise constitute a defense."); *Wood*, 648 P.2d at 88 n.18 (noting that

(continued)

time of Mr. Menzies's crime required that "the actor intentionally or knowingly" cause the death of another.[115] Mr. Menzies reads Dr. DeCaria's report to mean that Mr. Menzies's psychosis "caused him to forget killing Hunsaker." That assertion, even if true, would be insufficient to show that his mental illness impaired his ability to either intentionally or knowingly kill Mrs. Hunsaker.

¶116 Dr. Jeppsen's report also suggests that Mr. Menzies did not suffer from a mental illness that would rise to the level necessary to assert such a defense. His report cites a variety of Mr. Menzies's illnesses including depression, attention deficit disorder, and substance abuse problems, but nowhere does it assert that Mr. Menzies might have had a mental illness that would have negated the mens rea element of first degree murder. Dr. Jeppsen did diagnose Mr. Menzies with "major depression with psychotic features manifested by paranoid thinking and hallucinations." But Dr. Jeppsen never asserted that Mr. Menzies suffered from those conditions at the time of the murder. Dr. Jeppsen stated only that "[o]n the night of the murder Mr. Menzies was emotionally upset because of conflict with his wife and with a friend."[116] Dr. Jeppsen's report does not sufficiently link Mr. Menzies's "paranoid thinking and hallucinations" to his mental state at the time of the murder. The report merely states that Mr. Menzies was "emotionally upset," which is insufficient to show that a mental illness impaired his ability to form the necessary mens rea.

¶117 In sum, because neither Dr. Jeppsen nor Dr. DeCaria concluded that Mr. Menzies suffered from a mental illness that would have impaired his ability to form the requisite mens rea, it was entirely reasonable for trial counsel to choose not to rely on a mental illness defense. The reasonableness of trial counsel's decision to opt for a failure-of-proof defense was further

_____

diminished mental capacity "may also be a partial defense . . . if it negates a necessary specific intent").

[115] UTAH CODE § 76-5-202(1) (1986).

[116] The reference in Dr. Jeppsen's report to Mr. Menzies's "wife" is not a reference to Mr. Menzies's girlfriend at the time of the crime, Ms. Arnold. Rather, it is a reference to a woman he married when he was seventeen years old. The marriage was annulled before his incarceration for killing Ms. Hunsaker.

supported by Mr. Menzies's insistence that he knew where he was at the time Mrs. Hunsaker died and that he did not commit the murder.

¶118 Finally, Mr. Menzies's argument fails because trial counsel thoroughly investigated his case and presented a reasonable theory based on their investigation. Mr. Menzies's brief cites numerous ABA standards that require trial counsel to keep the defendant informed regarding preparation of the defense,[117] conduct a prompt and thorough investigation of the case,[118] and discuss strategic and tactical decisions with the client.[119] Our decisions have also noted the importance of counsel's duty of investigation. For instance, in *State v. Lenkart*, we held that counsel's performance was deficient where counsel failed to investigate physical evidence that might have corroborated the defendant's testimony that an alleged rape was actually consensual.[120] Counsel's failure came even after his client suggested that counsel look at the evidence.[121] We noted that "[t]rial counsel had no reason to disbelieve [his client] and had little to lose in performing the investigation."[122]

¶119 The situation here is unlike that in *Lenkart*. Here, it appears that trial counsel considered the possibility that

---

[117] ABA STANDARDS FOR THE DEFENSE FUNCTION 4-3.8 (1979) ("The lawyer has a duty to keep the client informed of the developments in the case and the progress of preparing the defense."); *id.* at 4-5.1(a) ("After informing himself or herself fully on the facts and the law, the lawyer should advise the accused with complete candor concerning all aspects of the case, including a candid estimate of the probable outcome.").

[118] *Id.* at 4-4.1 ("It is the duty of the lawyer to conduct a prompt investigation of the circumstances of the case and to explore all avenues leading to facts relevant to the merits of the case and the penalty in the event of conviction.").

[119] *Id.* at 4-5.2 (noting that certain decisions exclusively lie with the accused, including (1) what plea to enter, (2) "whether to waive jury trial," and (3) whether to testify, and that "all other strategic and tactical decisions are the exclusive province of the lawyer after consultation with the client.").

[120] 2011 UT 27, ¶ 29.

[121] *Id.*

[122] *Id.* ¶ 35.

Mr. Menzies might have some sort of mental illness because counsel ordered psychiatric evaluations by both Dr. DeCaria and Dr. Jeppsen. The results of those evaluations suggested that Mr. Menzies did not suffer from a mental illness that would negate or impair mens rea. Further, unlike *Lenkart*, trial counsel never received any indication from Mr. Menzies that he was mentally ill. Rather, he asserted he knew exactly what he was doing the day Mrs. Hunsaker died and that he did not commit the crime. And finally, this case is unlike *Lenkart* in that counsel's reliance on the sliver of evidence suggesting Mr. Menzies might have suffered from a mental illness would have contradicted his repeated testimony that he did not commit the crime. By contrast, in *Lenkart*, counsel's use of the physical evidence the defendant asserted counsel should have investigated would have corroborated, rather than contradicted, the defendant's testimony. Neither the ABA standards cited by Mr. Menzies nor our case law require counsel to pursue a defense after trial counsel has reasonably investigated the defense and found evidence suggesting that it would be unsuccessful and possibly even harmful to the defendant's case.

¶120 Based on the record and Mr. Menzies's proffer of evidence, it appears that trial counsel's decision to pursue a failure-of-proof defense was reasonable and did not constitute deficient performance. There were weaknesses in the State's case against Mr. Menzies that trial counsel reasonably tried to exploit. These weaknesses buttressed Mr. Menzies's insistence that he was innocent. Further, trial counsel investigated the possibility that Mr. Menzies was mentally ill and there was little evidence suggesting he suffered from a mental illness that impaired his ability to know that he was killing a person. For these reasons, Mr. Menzies fails to raise a genuine issue of material fact regarding the deficient performance prong of *Strickland*.

2. Trial Counsel Reasonably Challenged Testimony from Mr. Menzies's Fellow Inmate Mr. Britton, and Mr. Menzies Has not Shown Prejudice

¶121 Mr. Menzies next argues that trial counsel provided ineffective assistance because they did not discover and use evidence of mental illness to impeach testimony from one of Mr. Menzies's fellow inmates, Walter Britton. Because Mr. Menzies fails to raise any genuine issue of material fact concerning counsel's performance in this respect, or as to whether counsel's performance prejudiced the outcome, we affirm the PCC's grant of summary judgment. Again, before addressing

Mr. Menzies's claim, we recite additional facts to provide further context.

a. Additional facts relevant to trial counsel's treatment of Mr. Britton's testimony

¶122 During Mr. Menzies's preliminary hearing, Mr. Britton testified that while he and Mr. Menzies were in jail together, Mr. Menzies confessed to killing Mrs. Hunsaker and said that slitting her throat was one of the biggest thrills of his life. Mr. Britton refused to testify at trial, but the court agreed to admit his preliminary hearing testimony to the jury.

¶123 At that preliminary hearing, trial counsel cross-examined Mr. Britton. Among other things, he admitted that he heard about Mrs. Hunsaker's abduction on the news approximately a week before he told the police about Mr. Menzies's statements. He also testified that he watched the news more frequently after his first conversation with Mr. Menzies. Finally, Mr. Britton admitted that he did not report Mr. Menzies's statements to the police until about a month after Mr. Menzies made them. Ms. Wells pointed out to the jury during closing argument that Mr. Britton's testimony could have been derived from either the news or jail rumors.

¶124 Trial counsel also attempted to discredit Mr. Britton's testimony at trial. There, counsel called a jail officer who testified that the details of Mrs. Hunsaker's death were discussed by jail employees and inmates. The officer further testified that she heard several rumors in the jail regarding the crime and repeated those rumors.

¶125 Trial counsel also called Mr. Britton's attorney, Bruce Savage, at trial. Mr. Savage represented Mr. Britton in a federal case in which Mr. Britton was charged with bank robbery. Mr. Savage testified that, although Mr. Britton's participation in Mr. Menzies's case was supposed to earn Mr. Britton a sentence reduction, Mr. Britton ended up receiving no sentence reduction. In closing argument, Ms. Wells noted the possibility of Mr. Britton's bias and highlighted the fact that he refused to testify at trial after learning that he would receive no sentence reduction.

¶126 Mr. Menzies bases his claim that Mr. Britton suffered from a mental illness on a mental health evaluation of Mr. Britton conducted in Springfield, Missouri approximately five months before Mr. Menzies's preliminary hearing. In the evaluation report, the evaluator found that Mr. Britton "exaggerated and/or

lied in order to present himself as a more interesting, valuable person to others" and that he had "a marked disregard for the truth as indicated by his report lies." Mr. Menzies's current post-conviction counsel obtained the Springfield report in June 2011 under the Freedom of Information Act (FOIA).

¶127 Also, Mr. Menzies's post-conviction counsel obtained an affidavit from Mr. Britton where he recants much of his preliminary hearing testimony. In that affidavit Mr. Britton states that he lied about Mr. Menzies saying that cutting Mrs. Hunsaker's throat was the biggest thrill of his life. Mr. Britton also stated that he may have lied about Mr. Menzies's confession to killing Mrs. Hunsaker. Additionally, Mr. Britton suggested that his statements regarding Mr. Menzies could have been inaccurate because he was taking medication at the time.

> b. Mr. Menzies fails to show that trial counsel's decision to not impeach Mr. Britton's testimony with evidence of mental illness prejudiced his case

¶128 Mr. Menzies's ineffective assistance claim fails because he does not demonstrate that counsel's failure to obtain this report prejudiced the outcome of his trial. All he does in this regard is make conclusory statements. In one instance, Mr. Menzies states that "[f]ailure to review an available court file can be *Strickland* prejudice." He also states "failure to impeach a witness with mental illness evidence is *Strickland* prejudice when evidence reflects on the witness's credibility."

¶129 To support these assertions, Mr. Menzies cites two cases, both of which do not support his prejudice claim. The first is *Rompilla v. Beard*.[123] Here, Mr. Menzies cites, among other places, the Court's syllabus, which the Supreme Court has held provides no precedential value.[124] At any rate, *Rompilla* provides no help to Mr. Menzies's argument because it involved a case where counsel failed to "look at a file he [knew] the prosecution [would] cull for aggravating evidence."[125] The Court noted that the file that counsel failed to look at was easily available and that no

---

[123] 545 U.S. 374 (2005).

[124] *See United States v. Detroit Timber & Lumber Co.*, 200 U.S. 321, 337 (1906).

[125] *Rompilla*, 545 U.S. at 389.

reasonable lawyer would have ignored it.[126] That is not the case here. The file Mr. Menzies alleges counsel should have used here was apparently held by a federal court that did not respond to the trial investigator's inquiries.

¶130 The second case is *Virts v. State*,[127] a Texas Court of Criminal Appeals case. This case has nothing to do with ineffective assistance and simply stands for the proposition that "[c]ross-examination of a testifying State's witness to show that the witness has suffered a recent mental illness or disturbance is proper, provided that such mental illness or disturbance is such that it might tend to reflect upon the witness's credibility."[128] This proposition adds nothing to Mr. Menzies's prejudice claim. Mr. Menzies's conclusory statements are insufficient to raise a genuine issue of material fact regarding *Strickland* prejudice.

    c.  Mr. Menzies's claim of deficient performance fails because he has not shown that trial counsel had access or could have gained access to the Springfield report

¶131 Even if Mr. Menzies could satisfy his burden of showing prejudice, his claim would fail because he has not shown that trial counsel had access to the evidence, or could have obtained access through reasonable diligence. Mr. Menzies's claim instead relies on a variety of unsupported inferences to conclude that trial counsel knew about Mr. Britton's mental illness.

¶132 Counsel's duty to "adequately investigate the underlying facts of the case" is an important one because "investigation sets the foundation for counsel's strategic decisions about how to build the best defense."[129] But counsel's duty is to conduct an "adequate investigation."[130] Mr. Menzies appears to argue that this duty further obligates counsel to present evidence that was not obtained even after an adequate investigation.

¶133 Here, Mr. Menzies has failed to raise a genuine issue of material fact regarding trial counsel's investigation into whether Mr. Britton had a mental illness. Trial counsel's investigator

---

[126] *Id.*

[127] 739 S.W.2d 25 (Tex. Ct. Crim. App. 1987) (en banc).

[128] *Id.* at 30.

[129] *State v. Hales*, 2007 UT 14, ¶ 69, 152 P.3d 321 (internal quotation marks omitted).

[130] *Lenkart*, 2011 UT 27, ¶ 28.

testified that he served the federal court hearing Mr. Britton's case with a subpoena seeking Mr. Britton's psychological records, but received nothing back. Mr. Britton's attorney told trial counsel that the records were not public records and that he could not disclose confidential client information. Ms. Wells testified that the federal court hearing Mr. Britton's case had the only copy of the Springfield report, that she was unsuccessful in procuring the report, and that Mr. Britton's attorney did not have a copy.

¶134 Not only did trial counsel investigate Mr. Britton's background, but they also used their findings to impeach his testimony. In Ms. Wells's closing argument, she reminded the jury that Mr. Britton refused to testify after learning he would not get any benefit in his own case from doing so. Mr. Menzies apparently misunderstands trial counsel's purpose for telling this to the jury and states that the jury couldn't infer bias because "Britton did not get a deal." This is precisely the point trial counsel made to the jury. Counsel highlighted the weakness of Mr. Britton's testimony by showing that he was eager to testify against Mr. Menzies when he thought he might benefit by doing so, but he stopped cooperating once he realized that benefit would not materialize.

¶135 Mr. Menzies counters the State's assertion that trial counsel's investigation was reasonable by suggesting that the police reports available to trial counsel firmly established that Mr. Britton was mentally ill. But the portion of the report Mr. Menzies cites for this proposition states only that Mr. Britton was "sent out to Springfield, Missouri (inaudible) my attorney tried to get an irresistible impulse plea put on there." This report merely refers to the report that trial counsel did not have access to—it does not establish some other basis for finding that trial counsel should have searched elsewhere for evidence of Mr. Britton's alleged mental illness.

¶136 Additionally, Mr. Menzies makes the sweeping assertion that "Savage spoke to [trial counsel] about Britton prior to the preliminary hearing. Thus, it is reasonable to infer that [trial counsel] was aware of Britton's mental illness because of Savage's contact." Mr. Menzies's citation to the record here merely indicates that Mr. Savage talked to counsel before Mr. Britton testified against Mr. Menzies. There is nothing in the portion of the record cited by Mr. Menzies to support the inference that "[trial counsel] was aware of Britton's mental illness because of Savage's contact."

Opinion of the Court

¶137 Finally, Mr. Menzies argues that it is reasonable to infer that trial counsel could have used a FOIA request to obtain the Springfield report because Mr. Menzies's post-conviction counsel was able to obtain a copy of the report in 2011 pursuant to FOIA from the Federal Bureau of Prisons. On this point Mr. Menzies does not explain why this is a reasonable inference or what effect amendments to FOIA during the last twenty years would have on the analysis. Further, Mr. Menzies has not provided any evidence showing that the Federal Bureau of Prisons actually had the Springfield report during the time of trial. Trial counsel and Mr. Britton's attorney both suggested that the federal court hearing Mr. Britton's case had the only copy of the report and therefore the Federal Bureau of Prisons may not have had the report at that time. Trial counsel's investigator served the federal court a subpoena seeking mental health records but received no response. Mr. Menzies has failed to support his suggested inference that trial counsel could have used a FOIA request to obtain the Springfield report.

¶138 Mr. Menzies has not proffered sufficient evidence to overcome our "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance."[131] Accordingly, we hold that Mr. Menzies has not raised a genuine issue of material fact regarding the deficient performance prong of *Strickland*.

3. Trial Counsel Did not Render Ineffective Assistance Because They Reasonably Challenged Mr. Larrabee's and Ms. Brown's Testimony

¶139 Mr. Menzies next argues that trial counsel rendered ineffective assistance by improperly challenging Mr. Larrabee's and Ms. Brown's eye-witness testimony. Mr. Menzies raises two specific challenges in this regard. First, he argues that trial counsel should have elicited the specific reason that Mr. Larrabee and Ms. Brown were distracted at the time they reportedly saw Mr. Menzies and Mrs. Hunsaker. We reject this claim because Mr. Menzies fails to demonstrate deficient performance or prejudice. Second, he argues that trial counsel should have sought suppression of the testimony because it was inherently unreliable. On this point, Mr. Menzies has not shown that the identification procedures used were unnecessarily suggestive. Because he has thus failed to raise any genuine issue of material fact on either

---

[131] *Hales*, 2007 UT 14, ¶ 70 (quoting *Strickland*, 466 U.S. at 689).

point concerning counsel's performance, we affirm the PCC's grant of summary judgment.

    a.  Trial counsel did not render ineffective assistance by failing to elicit the specific reason Mr. Larrabee and Ms. Brown were distracted

¶140 During the most recent discovery period in this case, Mr. Menzies obtained four affidavits that all aver the same thing– Mr. Larrabee and Ms. Brown went to Storm Mountain to have an intimate sexual encounter. Mr. Menzies argues that trial counsel performed unreasonably in failing to interview Mr. Larrabee and Ms. Brown, learn about the nature of their distraction, and then use that knowledge at trial to impeach their testimony.

¶141 We reject this claim because trial counsel cross-examined Mr. Larrabee and Ms. Brown at trial and highlighted for the jury the weaknesses of their testimony. Mr. Larrabee admitted to the jury that his attention was turned towards Ms. Brown during the time he saw the man and woman walking at Storm Mountain. Mr. Menzies concedes that "Larrabee admitted his inconsistent statements at trial." Mr. Menzies does not explain how the jury knowing that Mr. Larrabee's attention was directed at Ms. Brown *for the purpose of having sexual relations* would have changed the outcome in the case. Further, eliciting the specific reason Ms. Brown and Mr. Larrabee were distracted might have hurt Mr. Menzies's case more than helped it. The jury might have concluded that Mr. Larrabee was so concerned about being caught with Ms. Brown that he was more focused on the man at Storm Mountain than he might otherwise have been.

¶142 Further, in his own affidavit, Mr. Larrabee stated only that he and Ms. Brown were "kissing." If Mr. Larrabee is unwilling to admit over twenty-five years after the event that he went to Storm Mountain to engage in sexual actions beyond kissing with Ms. Brown, on what basis are we to conclude now that he would have admitted this information to trial counsel or a jury? Mr. Menzies claims that an affidavit from his current counsel "revealed that . . . Larrabee's allusion to kissing Brown was expressed as a euphemism to induce Larrabee to sign it." But the point remains–if Mr. Larrabee is unwilling to admit now that he and Ms. Brown intended to have sex, we cannot presume that he would have admitted the same point to trial counsel or the jury.

¶143 In short, trial counsel's failure to elicit the specific reason that Mr. Larrabee and Ms. Brown were distracted was neither

unreasonable nor prejudicial, and Mr. Menzies has therefore failed to raise a genuine issue of material fact. Accordingly, we affirm the PCC's grant of summary judgment.

    b. Trial counsel's decision to impeach Mr. Larrabee's and Ms. Brown's eyewitness testimony rather than seek suppression was reasonable

¶144 Mr. Menzies also claims that the circumstances of Mr. Larrabee's and Ms. Brown's identifications were so suggestive that trial counsel rendered ineffective assistance by not seeking to suppress them. Because Mr. Menzies provides no basis for the conclusion that trial counsel could have had the photo array suppressed, and has thus failed to raise a genuine issue of material fact, we affirm the PCC's grant of summary judgment.

¶145 As a general rule regarding the validity of identification procedures, "due process concerns arise only when law enforcement officers use an identification procedure that is both suggestive and unnecessary."[132] Courts must "assess, on a case-by-case basis, whether improper police conduct created a 'substantial likelihood of misidentification.'"[133] In determining whether a photo array is impermissibly suggestive, we have stated that "the main question is whether the photo array emphasized the defendant's photo over the others."[134] Factors that we consider in answering that question include: (1) "whether the words and body language of the police officers who presented the array conveyed an attitude of disinterest," (2) "whether the officers manipulated the photos to indicate their belief that one of the photos portrayed the perpetrator," and (3) "whether the photos themselves were selected so that the defendant's photo stood out from the rest."[135]

¶146 As an initial matter, we note that neither Mr. Larrabee nor Ms. Brown ever made a firm identification of Mr. Menzies. Rather, Mr. Larrabee identified Mr. Menzies's photo as looking the most like the man he saw at Storm Mountain. And later Mr. Larrabee could not identify the man he saw during a lineup. Mr. Larrabee did ask the prosecutor after the lineup whether number six was the suspect and was told that number six was in

---

[132] *Perry v. New Hampshire*, 132 S. Ct. 716, 724 (2012).

[133] *Id.* (quoting *Neil v. Biggers*, 409 U.S. 188, 201 (1972)).

[134] *State v. Lopez*, 886 P.2d 1105, 1111 (Utah 1994).

[135] *Id.* at 1111–12.

fact Mr. Menzies. But the trial court struck this part of Mr. Larrabee's testimony. Ms. Brown also never made a firm positive identification of Mr. Menzies.

¶147 Even if we assume that Mr. Larrabee's and Ms. Brown's testimony is identification testimony, Mr. Menzies offers no evidence that is relevant to any of the three factors we use to determine whether identification procedures are suggestive. Instead, he offers conclusory assertions. For instance, he states that Mr. Larrabee's identification was unreliable because of "suggestive comments made by the police to Larrabee." But Mr. Menzies does not provide specifics regarding what comments the police made. He merely refers to "the suggestiveness of the mug shots."

¶148 Mr. Menzies's other assertions do not support the conclusion that the identification procedures were unduly suggestive, but simply undermine the weight of the identification testimony. For example, Mr. Menzies states that "[Detective] Judd admitted that if Larrabee only saw a profile the composite was inaccurate." He further states that "Larrabee and Brown were grossly distracted, and had no meaningful opportunity to observe or pay attention to the hiker." Even if true, these facts affect only the weight of Mr. Larrabee's identification testimony. They are irrelevant to the question of whether the identification procedures employed by the police were unnecessary and suggestive.

¶149 Finally, other indicia of suggestiveness cited by Mr. Menzies simply have no basis in the record. For instance, Mr. Menzies alleges that "[Officer] Couch used the composite to select [Mr. Menzies's] mug shot to presumably frame [Mr. Menzies]." Mr. Menzies provides no record citation to support this allegation. Further, Mr. Menzies states that during the photo array procedure the "police told Larrabee that he had picked the right man, and that they had [Mr. Menzies] in custody. Then after Mr. Larrabee picked the wrong man because he had a pot belly, the police told him that [Mr. Menzies] had lost 20 pounds." Mr. Menzies provides no citation to the record on this point, either. Our review of the record indicates, as the State suggests, that Mr. Larrabee selected Mr. Menzies's photo as looking most like the man he saw at Storm Mountain *before* the police told him that Mr. Menzies was in custody and mentioned anything about a weight change. Mr. Larrabee stated that at the time he picked Mr. Menzies's picture out of the photo array he did not know that the police had Mr. Menzies in custody. In fact, Mr. Larrabee learned that Mr. Menzies was in custody

approximately three months later. At the lineup, Mr. Larrabee identified someone other than Mr. Menzies. It was not until after the lineup that Mr. Larrabee learned about Mr. Menzies's weight change. This is not a case where the police told Mr. Larrabee that he picked the right man or ever implied as much.[136]

¶150 Only one fact cited by Mr. Menzies is even potentially relevant to determining suggestiveness. Mr. Menzies claims that "[Detective] Judd did not instruct Larrabee that the hiker may or may not be in the photo array." Mr. Menzies cites a federal district court case where the court recognized that "[s]uch an admonition is extremely important to avoid suggestiveness in the presentation of a photographic lineup to an adult witness . . . [and] is even more critical to avoid suggestiveness in the presentation . . . to a six-year-old child."[137] But the facts of that case differ in several important ways from the situation here. First, the witness in that case was a six-year-old child, whereas Mr. Larrabee was a high-school student. Second, there the police made suggestive statements such as telling the witness that she did an "awesome" and "fantastic" job after identifying the defendant.[138] In contrast, here the police made no such statements. The lone fact that Detective Judd did not tell Mr. Larrabee that the hiker may or may not be in the photo array is not enough for us to conclude that trial counsel acted unreasonably in not seeking to suppress the identification as unnecessarily suggestive.

¶151 Mr. Menzies has not raised a genuine issue of material fact regarding trial counsel's decision to impeach Mr. Larrabee's and Ms. Brown's testimony. Trial counsel acted reasonably in pointing out the flaws in the testimony rather than seeking to

---

[136] Mr. Menzies cites a Ninth Circuit case, *United States v. Simoy*, as being similar to the case here. 998 F.2d 751 (9th Cir. 1993). There the government conceded that an identification procedure was suggestive where an officer looked at a sketch drawn using the help of a witness and then "held up a photograph of [the defendant] . . . [and] commented that the photo closely matched the sketch and asked [the witness] if the photograph resembled the person he had witnessed the night of the robbery." *Id.* at 752.

[137] *Oliva v. Hedgpeth*, 600 F. Supp.2d 1067, 1080 (C.D. Cal. 2009) (footnote omitted).

[138] *Id.* at 1081 (internal quotation marks omitted).

suppress it on the ground that the police used unnecessarily suggestive tactics.

¶152 Additionally, Mr. Menzies's ineffective assistance claim would fail in any case because he has not made a sufficient showing of prejudice. His only argument regarding prejudice on this claim is that "there is a good chance that had LDA moved to strike the identifications, the motion would have been granted, and the result of the trial would have been different." This merely restates the basic prejudice standard and provides no analysis regarding why it would be the case. For these reasons we affirm the PCC and reject Mr. Menzies's claim that trial counsel was ineffective in dealing with Ms. Brown's and Mr. Larrabee's testimony.

4. Mr. Menzies Has not Shown that the Liability Waiver Denied Him His Right to Conflict-Free Counsel

¶153 Mr. Menzies argues that his counsel rendered ineffective assistance because they denied him his right to conflict-free counsel when they had him sign a liability waiver. He also suggests that this initial conflict "tainted" the appellate and post-conviction proceedings. We reject Mr. Menzies's claims because he has not shown that the liability waiver created an actual conflict of interest. Because Mr. Menzies has not made a threshold showing that a conflict even existed, we do not reach the issue of whether the alleged conflict caused counsel to render deficient performance.

¶154 The parties agree that Mr. Menzies signed the liability waiver before trial. The waiver provides:

> I, RALPH LEROY MENZIES, defendant in Criminal Case No. CR 86-887 assigned to the Third District Court of the Third Judicial District, Judge Raymond S. Uno presiding, hereby acknowledge that I have refused to provide my counsel, Brooke C. Wells and Frances M. Palacios, with the names of witnesses who may have evidence pertinent to the defense of the above-referenced case.
>
> I hereby waive any and all claims which I might have against Brooke C. Wells and Frances M. Palacios or the Sale Lake Legal Defender Association as a result of the failure of such witnesses to be interviewed or presented as witnesses in any proceeding pertaining to this case, including trial.

Opinion of the Court

¶155 There is some uncertainty regarding the preparation of the waiver. Ms. Wells claimed that the form was fully filled out at the time Mr. Menzies signed it. Mr. Menzies alleges that it was blank when he signed it. There is also some uncertainty regarding the scope of the waiver. It provided that counsel would not be liable for Mr. Menzies's failure to provide the names of all "witnesses who may have evidence pertinent to the defense." The parties appear to agree, however, that it was drafted with only one person in mind: Mr. Menzies's girlfriend, Nicole Arnold. Mr. Menzies did not want Ms. Arnold to testify and refused to consent to calling her as a witness. According to Mr. Menzies, Ms. Arnold would have testified, among other things, that Mrs. Hunsaker "was with Mr. Menzies voluntarily on the night of her disappearance." Ultimately, these factual disputes do not create a genuine issue of material fact because, even accepting Mr. Menzies's proffer, we conclude that there was no actual conflict of interest.

¶156 A criminal defendant has a right to counsel free from conflicts of interest. "[T]he right to counsel is the right to the effective assistance of counsel,"[139] and we have held that "[t]he right to counsel includes the right to counsel free from conflicts of interest."[140] "[C]ounsel owes the client a duty of loyalty, a duty to avoid conflicts of interest."[141]

¶157 To prevail on an ineffective assistance claim grounded on an alleged conflict of interest, a petitioner "must show that an actual conflict of interest adversely affected his lawyer's performance."[142] To establish an actual conflict, the petitioner "must demonstrate as a threshold matter . . . that the defense

---

[139] *McMann v. Richardson*, 397 U.S. 759, 771 n.14 (1970).

[140] *Lafferty*, 2007 UT 73, ¶ 62.

[141] *Strickland*, 466 U.S. at 688.

[142] *State v. Taylor*, 947 P.2d 681, 686 (Utah 1997) (internal quotation marks omitted); *see also Cuyler v. Sullivan*, 446 U.S. 335, 350 (1980) ("We hold that the possibility of conflict is insufficient to impugn a criminal conviction. In order to demonstrate a violation of his Sixth Amendment rights, a defendant must establish that an actual conflict of interest adversely affected his lawyer's performance."); *United States v. Burney*, 756 F.2d 787, 792 (10th Cir. 1985) ("The conflict must be real rather than hypothetical.").

attorney was required to make a choice advancing his own interests to the detriment of his client's interests."[143] There is no need for the petitioner to show prejudice once it is established that counsel had an actual conflict of interest.[144]

¶158 Mr. Menzies repeatedly points out that we may presume prejudice where there is an actual conflict of interest. But he fails to clearly articulate his position regarding the threshold inquiry— that is, how the waiver created an actual conflict. He argues that execution of the waiver resulted in a conflict in the following ways (although none of these arguments are developed extensively): (1) it created an inference of a conflict because it violated the Utah Rules of Professional Conduct, (2) it created a conflict by creating an incentive for counsel to use a failure of proof defense in lieu of a mental illness defense, and (3) it led counsel to conduct a "half-baked" investigation. We reject each of these arguments.

¶159 First, Mr. Menzies argues that the waiver created a conflict because it violated rule 1.8(h)(1) of the Utah Rules of Professional Conduct, which prohibits counsel from "mak[ing] an agreement prospectively limiting the lawyer's liability to a client for *malpractice*."[145]

¶160 We disagree with Mr. Menzies's assertion that the waiver is a malpractice liability waiver that violated the Utah Rules of Professional Conduct. It does not purport to be a blanket waiver of any future malpractice claims Mr. Menzies may have against his trial counsel. Rather, it explicitly memorializes the fact that the decision not to interview or present certain witnesses was Mr. Menzies's, not counsel's, so that the decision will not be improperly construed as malpractice. The comments to rule 1.8(h)(1) explain that malpractice liability waivers are forbidden because "they are likely to undermine competent and diligent representation."[146] The liability waiver here offered counsel no protection from malpractice claims generally, so it in no way undermined counsel's competent representation and created no

---

[143] *Taylor*, 947 P.2d at 686 (alteration in original) (internal quotation marks omitted).

[144] *Id.*

[145] UTAH R. PROF'L CONDUCT R. 1.8(h)(1) (emphasis added).

[146] *Id.* R. 1.8 cmt. [14].

disincentive for counsel to work any less diligently. Counsel would still have been liable for malpractice resulting from their own failures. The liability waiver merely clarified that the decision to not pursue certain witnesses was not counsel's but was instead Mr. Menzies's. If anything the waiver created an incentive for counsel to diligently represent Mr. Menzies because they now had to overcome the limitation Mr. Menzies placed on them.

¶161 In a related argument, Mr. Menzies also claims that trial counsel created a conflict of interest by failing to comply with a Utah State Bar Ethics Advisory Opinion Committee opinion. The opinion was issued on September 30, 2013, and prohibits counseling a client "to enter into a plea agreement which requires the client to waive the attorney's prospective possible ineffective assistance at sentencing or other postconviction proceedings."[147] This argument is also without merit. First, counsel's actions cannot be evaluated under an ethics opinion issued over twenty years after the representation. And second, the liability waiver here is distinguishable from the type of waiver prohibited by the ethics opinion because it did not waive ineffective assistance claims but instead only waived claims to the extent Mr. Menzies refused to cooperate and identify the names of witnesses.

¶162 Moreover, even if the liability waiver did violate the Utah Rules of Professional Conduct we would still conclude, as the PCC did, that the waiver did not result in an actual conflict. This is because a violation of the Utah Rules of Professional Conduct does not, by itself, constitute ineffective assistance.[148] Instead, Mr. Menzies must show that counsel made "a choice advancing his own interests to the detriment of his client's interest."[149] He must show how a violation of the rules of professional conduct, in connection with counsel's specific actions in this case, created a conflict of interest.

---

[147] UTAH STATE BAR ETHICS ADVISORY OPINION COMMITTEE, Op. 13-04, 1 (Sept. 30, 2013).

[148] *United States v. Gallegos*, 39 F.3d 276, 279 (10th Cir. 1994) ("It is apparent that some elements [of the rules] bear on" constitutional issues; "a violation of the rules will not in itself constitute a constitutional violation.").

[149] *Taylor*, 947 P.2d at 686 (internal quotation marks omitted).

¶163 Mr. Menzies points to two actions by counsel that he believes evidence such conflict. He first argues that the waiver created an actual conflict because it created an incentive for counsel to pursue a failure-of-proof defense rather than a mental illness defense. He argues that "since [counsel] failed to use a readily available and cogent mental illness defense . . . it is reasonable to infer that [counsel's] conflict of interest prejudiced Mr. Menzies." But he has not indicated beyond inference how execution of the waiver actually led to or caused trial counsel to advance a failure-of-proof defense in lieu of a mental illness defense. Further, as we noted above, trial counsel's decision to opt for a failure-of-proof defense instead of a mental illness defense was a reasonable strategic choice. We decline to give credence to this claimed inference as proof of actual conflict.

¶164 And second, Mr. Menzies suggests that "the conflict resulted in [counsel] doing a half-baked investigation." This argument fails for two reasons. First, Mr. Menzies has not shown how the waiver led counsel to conduct a deficient investigation. Indeed, as we noted above, if anything the waiver created an incentive for counsel to conduct a more thorough investigation to overcome the hurdles placed in their way by Mr. Menzies. Moreover, counsel reasonably chose to pursue a failure-of-proof defense only after they adequately investigated the possibility that Mr. Menzies suffered from a mental illness.[150] Mr. Menzies's suggestion that counsel conducted a "half-baked investigation" is flatly wrong.

¶165 We accordingly reject Mr. Menzies's argument that trial counsel labored under a conflict of interest because he has not established that counsel was required to make a choice advancing their interests to his detriment.

5. Conclusion—Guilt-Phase Ineffective Assistance of Counsel

¶166 In conclusion, we hold that Mr. Menzies has not raised a genuine issue of material fact regarding trial counsel's guilt-phase representation. Trial counsel's decision to use a failure-of-proof defense strategy was reasonable and Mr. Menzies has not shown that counsel's failure to use a mental illness defense prejudiced his case. Additionally, trial counsel's treatment of Mr. Britton's testimony was reasonable given the facts available to them and Mr. Menzies has not alleged facts that raise a genuine issue as to

---

[150] *Supra* ¶¶ 118–20.

whether counsel had access to any evidence of Mr. Britton's alleged mental health problems. Further, trial counsel adequately challenged Mr. Larrabee's and Ms. Brown's testimony. Finally, Mr. Menzies is unable to show that signing the liability waiver created an actual conflict of interest such that he was denied his right to conflict-free counsel. Accordingly, we affirm the PCC's grant of summary judgment with respect to each of Mr. Menzies's claims of guilt-phase ineffective assistance.

### C. *Mr. Menzies Has not Raised a Genuine Issue of Material Fact Regarding Trial Counsel's Penalty-Phase Representation*

¶167 Before discussing the merits of Mr. Menzies's ineffective assistance of counsel claims at the penalty phase, we first provide additional facts to give context to his three categories of claims: (1) inadequate qualifications and preparation, (2) failure to investigate, and (3) failure to present adequate mitigating evidence. Next, we discuss the relevant standard and applicable ABA guidelines. We ultimately reject Mr. Menzies's ineffective assistance of counsel claims under each category because they are either raised for the first time on appeal or he fails to demonstrate prejudice. As a final matter, we reach his claim that the PCC improperly struck Judge Uno's affidavit and conclude that the affidavit is immaterial.

1. Additional Facts Relevant to Trial Counsel's Penalty-Phase Representation

¶168 During the penalty phase, the State highlighted Mr. Menzies's extensive criminal background. His prior crimes included three robberies. The first occurred on December 21, 1975. On that occasion, Mr. Menzies stole a truck from a dealership and picked up a partner. The two intended to rob someone and steal the person's marijuana. Instead, Mr. Menzies and his partner robbed a 7-11 convenience store. Mr. Menzies threatened the store clerk with a gun, ordered him to a back room, and ran away with money from the cash register. The second robbery occurred five days later. After Mr. Menzies and his partner stole another truck from a different dealership, the two proceeded to rob the same 7-11 store and the same store clerk. But this time, Mr. Menzies insisted the clerk leave the store with him and his partner. Once out of town, the robbers dropped the clerk off, told him to get into a nearby ditch, and said that if he stuck his head out they would blow it off. The third robbery happened after Mr. Menzies escaped from jail in 1978 while serving time for the first two robberies. After escaping, he robbed a cab driver. During that robbery, he pointed a shotgun at the cab driver's head. He took

$76 in cab fares and $1 from the cab driver's wallet. When the cab driver attempted to reach for a gun, Mr. Menzies shot him in the right arm. Five surgeries and ten years later at sentencing proceedings, the cab driver still could not write with his right hand.

¶169 The State also pointed to acts by Mr. Menzies before trial to show that he could not be rehabilitated. For instance, while Mr. Menzies underwent evaluation by the Utah State Hospital, Ms. Arnold sneaked him a screw driver. The State's brief suggests Mr. Menzies intended to unscrew blocks securing the hospital windows. Additionally, Mr. Menzies kept a sharpened metal dust pan handle under his mattress. During his time in the Salt Lake County Jail, Mr. Menzies told a jail officer that the officer did not know the problems Mr. Menzies could cause. Mr. Menzies threatened to take out a guard or another inmate. Eventually, the jail transferred him to the behavior modification unit. The State argued that Mr. Menzies's criminal history, combined with the circumstances of Mrs. Hunsaker's murder, showed that he posed a continuing threat of violence and could not be rehabilitated.

¶170 Ms. Wells and Ms. Palacios called several witnesses to rebut the State's case and argued that Mr. Menzies should not receive the death penalty. Mr. Menzies's aunt and sister testified regarding his family history and circumstances. Their testimonies detailed various abuses Mr. Menzies endured as a child. For instance, they testified that his stepfathers abused him daily, raped his mother, belittled him for failing to kill a rabbit, burned the family car to prevent his mother from leaving home, and beat his pregnant mother so severely that her child died shortly after birth. Mr. Menzies's mother often left the family for extended periods of time. She died when he was only fourteen. After his mother's death, Mr. Menzies's stepfathers took everything the mother had and did not provide for Mr. Menzies. Mr. Menzies's family characterized him as giving and compassionate. They stated that they hoped he would receive only a life sentence. Mr. Menzies's sister noted she would feel a tremendous void if the court sentenced Mr. Menzies to death.

¶171 Mr. Menzies's family also provided a certificate from Alcoholics Anonymous and poems and letters from Mr. Menzies. Mr. Menzies explained in one letter that he committed the previous robberies because he felt rejected, and that he blamed only himself for those prior crimes.

¶172 Douglas Wingleman, an educational psychologist, testified regarding Mr. Menzies's mental state. Dr. Wingleman

said Mr. Menzies suffered from mental deficits that prevented him from responding appropriately to his surroundings. He noted, however, that with proper treatment Mr. Menzies might be able to function normally.

¶173 Michael DeCaria, a clinical psychologist, also testified. Dr. DeCaria emphasized the turbulent childhood Mr. Menzies was forced to endure and the detrimental effects it had on him. Dr. DeCaria noted that Mr. Menzies's stepfathers hit him, forced him to sleep in a very small room with his sister for three years, denied him dinner, and kept him home from school. Dr. DeCaria further noted that Mr. Menzies's problem with substance abuse resulted from his desire to alter his consciousness and make his world better. Dr. DeCaria stated that Mr. Menzies had no real caretaker growing up because of his stepfathers' abuse, his mother's early death, and his sister's obligation to help care for his sickly younger brother. Dr. DeCaria opined that people raised like Mr. Menzies often do not develop a normal conscience. In Dr. DeCaria's opinion, Mr. Menzies suffered from three distinct personality disorders. Dr. DeCaria testified, however, that Mr. Menzies may still have time to change. He noted that antisocial behavior tends to decline around age thirty, and Mr. Menzies was twenty-nine at the time. He also suggested that Mr. Menzies had a desire to change his behavior. Finally, he said that Mr. Menzies had the potential to function near a college-student level.

¶174 Trial counsel called Laddy Pruett, a prison social worker, to testify. Mr. Pruett testified that, based on Mr. Menzies's criminal history and jail experience, he would be placed on twenty-three hour lockdown. He would be entitled to limited supervised recreation, no work release, and would never be left alone on prison grounds. On the other hand, Mr. Pruett stated that Mr. Menzies took pride as a janitor during a prior prison stint and took pride in his family. Mr. Pruett indicated, that during the time he worked with him, Mr. Menzies did not try to escape or fight with others. In fact, Mr. Menzies had no disciplinary action against him for twenty-two months before being released from prison.

¶175 Trial counsel also called Paul Sheffield, the Utah Board of Pardons Administrator, to testify regarding the likelihood of parole in a similar case. Mr. Sheffield outlined the factors the Board of Pardons would consider and concluded that Mr. Menzies would likely serve his entire sentence in prison.

¶176 Judge Uno balanced the mitigating and aggravating evidence. In the end, he concluded that the aggravating circumstances outweighed any mitigating evidence and sentenced Mr. Menzies to death.

2. Relevant Standard and ABA Guidelines

¶177 The *Strickland* standard applies to a claim of penalty-phase ineffective assistance of counsel — that is, to prevail, a defendant must establish both deficient performance and prejudice.[151] The same "strong presumption that trial counsel rendered adequate assistance" applies as well.[152] A defendant's burden to prevail on an ineffective assistance of counsel claim at the penalty phase differs slightly, however, from his burden at the guilt phase. First, to show deficient performance at the penalty phase, a defendant must establish that, "under the prevailing professional norms at the time of [the defendant's] trial,"[153] counsel failed to adequately investigate[154] and present[155] appropriate background and mitigating evidence. And as discussed, *supra* ¶¶ 83–88, applicable ABA standards are relevant, but not dispositive in our analysis of counsel's performance in this respect.

¶178 Second, to establish prejudice, a defendant must show both that counsel should have presented the evidence proffered in post-conviction review, and that there was a "reasonable probability the sentence would have been different if the sentencing judge and jury had heard the significant mitigation evidence" that defendant's counsel failed to investigate or present.[156] And "[a] reasonable probability is a probability sufficient to undermine confidence in the outcome"—which "requires a substantial, not just conceivable, likelihood of a

---

[151] *Archuleta*, 2011 UT 73, ¶ 38.

[152] *Id.* ¶ 39; *see also Cullen*, 131 S. Ct. at 1403 (reaffirming the presumption from *Strickland* in the context of an ineffective assistance of counsel challenge brought to penalty-phase counsel's actions).

[153] *Porter v. McCollum*, 558 U.S. 30, 39–40 (2009).

[154] *Id.*

[155] *See Williams v. Taylor*, 529 U.S. 362, 393 (2000).

[156] *Porter*, 558 U.S. at 31.

different result."[157] Although Mr. Menzies claims that he must only establish "*some* possibility that a life sentence would have been imposed," (emphasis added), this is simply not the standard. A defendant cannot merely present evidence that "would barely have altered the sentencing profile"[158] or that "would likely only have added color to what [a witness] actually did testify to at the penalty phase."[159]

¶179 Mr. Menzies raises several ineffective assistance of counsel claims with respect to penalty-phase counsel's qualifications, as well as counsel's investigation and presentation of his case. While we recite the specific ABA/NLADA guidelines in our discussion of each respective claim, it is worth repeating that these guidelines do not set a baseline for counsel's Sixth Amendment constitutional duty of adequate representation. Rather, and as the PCC itself correctly recognized, they only "form some basis of comparison" to evaluate counsel's performance.

### 3. Claims of Inadequate Qualifications and Early Preparation

¶180 Mr. Menzies first challenges his counsel's performance by claiming that they lacked any training in how to conduct a capital mitigation investigation. Indeed, co-counsel Ms. Palacios admitted as much. In making this claim, Mr. Menzies cites to NLADA Standard 5.1.I.B.,[160] which covers the qualifications of trial co-counsel; he claims this standard required Ms. Palacios's disqualification. Mr. Menzies also claims that counsel performed ineffectively in failing to initiate the mitigation investigation until

---

[157] *Cullen*, 131 S. Ct. at 1403 (internal quotation marks omitted).

[158] *Strickland*, 466 U.S. at 700.

[159] *Gardner v. Galetka*, 568 F.3d 862, 881 (10th Cir. 2009).

[160] The standard requires, among other qualifications, that attorneys have "at least three years litigation experience in the field of criminal defense," NLADA STANDARDS FOR THE APPOINTMENT OF COUNSEL IN DEATH PENALTY CASES 5.1.I.B (ii)(a) (1988), and also "have prior experience as lead counsel or co-counsel in no fewer than three jury trials of serious and complex cases which were tried to completion, at least two of which were trials in which the charge was murder or aggravated murder; or alternatively, of the three jury trials, at least one was a murder or aggravated murder trial and one was a felony jury trial." *Id.* 5.1.I.B(ii)(b).

*after* the guilt phase had ended. To support this claim, he cites NLADA Standard 11.4.1(a)[161] and ABA Standard 4-4.1.[162] We reject both claims.

¶181 First, Utah Rule of Criminal Procedure 8, rather than the cited NLADA/ABA standards, sets the "minimum standards for defense counsel in a capital case."[163] In terms of qualifications, rule 8 sets forth the minimum levels of litigation and courtroom experience required of counsel at both trial and on appeal. The rule makes clear, however, that "[m]ere noncompliance with this rule . . . shall not of itself be grounds for establishing that appointed counsel ineffectively represented the defendant at trial or on appeal."[164] And as we stated in *Taylor v. Warden*, a "[defendant's] arguments regarding the *experience* of his counsel have no relevance to [defendant's] claim of *ineffective assistance*."[165] "Instead, we look to counsel's actual performance to determine whether it was adequate."[166] Accordingly, we reject his claim that counsel rendered ineffective assistance merely by virtue of their inadequate qualifications under NLADA Standard 5.1.I.B.

¶182 We turn now to Mr. Menzies's claim that counsel delayed in initiating an investigation. We ultimately affirm the PCC's ruling rejecting this claim because he fails to demonstrate prejudice. The NLADA standard applicable to investigation timing requires only that the mitigation investigation should "begin immediately upon counsel's entry into the case and should be pursued expeditiously."[167] And the relevant ABA standard requires only that "counsel should conduct a *prompt*

---

[161] This standard requires counsel to conduct independent investigations at the guilt and penalty phases and that "[b]oth investigations should begin immediately upon counsel's entry into the case and should be pursued expeditiously." *Id.* 11.4.1(a).

[162] This standard requires only that "counsel should conduct a *prompt* investigation." ABA STANDARDS FOR THE DEFENSE FUNCTION 4-4.1 (1979) (emphasis added).

[163] *Taylor v. Warden*, 905 P.2d 277, 282 n.2 (Utah 1995).

[164] UTAH R. CRIM. P. 8(f).

[165] 905 P.2d at 282.

[166] *Id.*

[167] NLADA STANDARDS FOR THE APPOINTMENT OF COUNSEL IN DEATH PENALTY CASES 11.4.1(a) (1988).

investigation."[168] The PCC correctly noted that the only "real" factual dispute concerned when the mitigation investigation began. It also ruled that Mr. Menzies's claim failed regardless because he did not show how the late initiation of the investigation prejudiced, in any way, the outcome of the case. We agree. Even if it is true that counsel did not begin the mitigation investigation until *after* the guilt phase, and thus not "immediately upon counsel's entry" as suggested by the NLADA guidelines, Mr. Menzies failed to demonstrate how this prejudiced his case. Furthermore, the evidence actually suggests that counsel *did* initiate the mitigation investigation before the guilt phase began, since Dr. DeCaria interviewed Mr. Menzies over fourteen months before trial.

4. Failure-to-Investigate Claims

¶183 As noted above, a defendant can prevail under a failure-to-investigate claim only by demonstrating both that counsel's investigation was deficient under the prevailing professional norms and that the defendant was prejudiced thereby—in other words, that if counsel had presented the information at trial, there would have been a substantial likelihood of a different result. The Sixth Amendment does *not* require counsel to interview every possible relative or acquaintance or to fully investigate every potential lead. Counsel has a duty only "'to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.'"[169] Still, there must be a reasonable, articulable reason for not interviewing a particular witness or for not following a particular lead. "[F]ailing to investigate because counsel does not think it will help does not constitute a strategic decision, but rather an abdication of advocacy."[170] That said, "[t]he mere fact that other witnesses might have been available or that other testimony might have been elicited from those who testified is not a sufficient ground to prove ineffectiveness of counsel."[171] Indeed, the witnesses who

---

[168] ABA STANDARDS FOR THE DEFENSE FUNCTION 4-4.1 (1979) (emphasis added).

[169] *Kimmelman v. Morrison*, 477 U.S. 365, 384 (1986) (quoting *Strickland*, 466 U.S. at 691).

[170] *Lenkart*, 2011 UT 27, ¶ 28 (internal quotation marks omitted).

[171] *Waters v. Thomas*, 46 F.3d 1506, 1514 (11th Cir. 1995) (internal quotation marks omitted).

were called may have sufficiently conveyed the necessary mitigating information. And counsel's decision not to investigate is reviewed "for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments."[172]

¶184 Mr. Menzies argues that counsel failed to investigate multiple individuals and related issues, but a number of these arguments are raised for the first time on appeal.[173] As to his arguments that are preserved, he claims that counsel failed to investigate: (1) details of sexual molestation; (2) school records evincing psychological troubles; (3) early mental illness; (4) fetal alcohol syndrome (FAS); (5) neglect and abuse by his step-father, his father, and mother; (6) the amounts and kinds of drugs and alcohol he ingested prior to the murder; and (7) the effect of his parents' divorce.

¶185 We conclude that counsel's investigation of Mr. Menzies's mental health issues and his background for purposes of mitigation was sufficiently comprehensive and thus did not constitute deficient performance. Mr. Menzies's counsel used three different mental health professionals to evaluate any potential psychological issues. His counsel interviewed his sister and aunt to understand his childhood and background. They investigated the prison conditions and potential for rehabilitation if Mr. Menzies were given life in prison. None of the seven issues Mr. Menzies claims counsel failed to investigate thus survives review.

¶186 First, there was no evidence of sexual molestation provided by any of the mental health professionals or Mr. Menzies's sister or aunt. Although Mr. Menzies claims otherwise in his briefing, his own affidavit does not raise this issue, and an affidavit from a mitigation specialist, Marissa Sandall-Barrus, mentions only that "[d]uring my mitigation investigation there was some information provided that indicated [Mr. Menzies] may have been molested by his step-

---

[172] *Kimmelman*, 477 U.S. at 384 (internal quotation mark omitted).

[173] Mr. Menzies raises multiple new failure-to-investigate claims on appeal, including that counsel failed to interview his grandparents or a "wife," and that counsel failed to review a state petition for child neglect and request a pre-sentence report. We therefore disregard them as procedurally barred.

mother." Other than this brief reference, there is nothing to indicate where this "some information" came from or that a reasonable investigation would have uncovered such evidence. Therefore, we reject this claim.

¶187 Second, Mr. Menzies claims that counsel failed to investigate school records that detailed his problems in school, including prolonged absences and abuse recognized by school administrators and teachers. Again, Mr. Menzies's own affidavit does not raise this issue. And Ms. Sandall-Barrus noted in her affidavit that LDA had access to the school records, but that a portion of them were missing and are no longer available. Even if counsel performed deficiently in failing to search for the missing records (years 1986 to 1988), Mr. Menzies has made no showing of prejudice based on what the included education records demonstrated. In fact, the school records that were in the record give evidence only of a very poor track record of attendance—nothing else sustains a conclusion that the un-investigated records, if included, would have impacted the case in any way.

¶188 As to Mr. Menzies's third, fourth, and fifth failure-to-investigate claims, we conclude that there *was* adequate investigation. First, Mr. Menzies's counsel hired no less than three mental health professionals to assess him as to any current and prior mental health problems. Second, Mr. Menzies's own brief concedes that there was nothing material to suggest that he suffered from FAS.[174] The fact that his father and grandparents were alcoholics and that his mother was a bar maid do not sustain a conclusion that counsel's performance was deficient for failure to investigate the *possibility* of FAS. Finally, there was a host of evidence presented at trial concerning Mr. Menzies's abuse as a child. This was offered through mental health experts, as well as through his sister and aunt.

¶189 Mr. Menzies's sixth and seventh failure-to-investigate claims fail as well, because he has failed to show that counsel's failure to more comprehensively investigate these issues prejudiced his case in any way. Mr. Menzies first claims that counsel did not investigate the amounts and kinds of drugs and alcohol he had consumed at the time of the murder. He argues that Utah Code section 76-3-207(2)(d) (1983 Supp.) required counsel to present this information as a mitigating factor. In fact,

---

[174] His brief states that "[t]here is no direct evidence of this fact"—that he may have suffered from FAS.

counsel *did* present mitigating evidence under section 76-3-207(2)(d) (1983 Supp.), which suggests counsel present evidence concerning "intoxication, or influence of drugs." At sentencing, counsel questioned Dr. DeCaria, a mental health professional, and asked whether Mr. Menzies was under the influence of drugs or alcohol at the time of the murders. Dr. DeCaria responded that "he was using alcohol and other drugs heavily during the few days before his incarceration." Dr. DeCaria then went on to talk about the multiple effects of such drug and alcohol use. Because evidence of heavy drug use and alcohol consumption was clearly investigated and presented, we reject this argument.

¶190 Finally, Mr. Menzies does not show how an investigation of the effects of the divorce of his parents would have added anything material to the mental health professionals' assessment. As the State points out, counsel presented numerous "gruesome" details concerning Mr. Menzies's abuse and neglect; additional information concerning his parents' divorce would have been unlikely to affect the sentence, given the myriad details that *were* investigated and presented, including the effect of Mr. Menzies's mother's death.

¶191 In sum, Mr. Menzies has not overcome the "strong presumption" that counsel's performance was constitutionally compliant.[175] And he has also failed to demonstrate that counsel's performance prejudiced his case. Accordingly, we reject each of his failure-to-investigate claims and affirm the PCC's grant of summary judgment for the State.

5. Presentation of Background Evidence and Organic Brain Evidence

¶192 Finally, Mr. Menzies argues that penalty-phase counsel was ineffective for failing to present sufficient background evidence and evidence concerning organic brain evidence. We now address these arguments.

a. Mr. Menzies's counsel presented sufficient background evidence

¶193 First, Mr. Menzies claims that his penalty-phase counsel was ineffective for not presenting sufficient background evidence. In particular, he claims that counsel was required, constitutionally, to include a social history report and have a

---

[175] *Strickland*, 466 U.S. at 689.

forensic social worker testify as part of the mitigation defense. He claims that Dr. DeCaria gave only a psychological evaluation, which did not constitute a sufficient social history. We reject this claim because counsel did provide a sufficient social history through multiple witnesses. And Mr. Menzies has cited no rule for the proposition that counsel was required to have a mental health professional, specifically, give this social history.

¶194 ABA Guideline 11.8.6(B) (1989) suggests that counsel present mitigating evidence of the following: (1) medical and mental health history, including substance abuse; (2) educational history; (3) military service; (4) employment and training history; (5) family and social history, including physical, sexual, or emotional abuse, neighborhood surroundings and peer influence, prior correctional experience and professional intervention; (6) rehabilitation potential; (7) record of prior offenses, especially where there is no record, a short record, or a record of non-violent offenses; and (8) expert testimony concerning any of these seven factors and the resulting impact on the defendant.

¶195 We conclude, consistent with the PCC's determination, that penalty-phase counsel presented evidence under each of these factors. As noted in our factual sections above, *supra* ¶¶ 19, 168–76, counsel utilized multiple witnesses and professionals to provide a proper mitigation defense. This includes: (1) extensive evidence of Mr. Menzies's social history and mental health, including physical, emotional and psychological abuse, as well as substance abuse; (2) evidence of Mr. Menzies's educational background in elementary and middle school; (3) evidence of Mr. Menzies's prior employment and prior incarcerations, including employment in prison; and (4) Mr. Menzies's rehabilitative potential, that he would likely never be released, and that he would be held under very restrictive conditions. Moreover, counsel presented evidence of how this background affected his mental health and psychological condition through multiple witnesses, including two mental health professionals— Dr. DeCaria and Dr. Wingleman. Counsel also called Mr. Menzies's sister and aunt to provide graphic descriptions of Mr. Menzies's home and social life and abuse.

¶196 Mr. Menzies claims that there was *additional* evidence under most of these factors that should have been raised, but we affirm the PCC's determination that the additional evidence and witnesses were unnecessary. For example, he claims that counsel should have called multiple additional witnesses to testify, including his biological father, his step-fathers and step-mother, and his teachers. But as the PCC recognized, each of these

witnesses was either inaccessible or would have been unhelpful, if not damaging, to Mr. Menzies's mitigation defense. For instance, his biological father was inaccessible because he had not been seen for twelve years. Furthermore, Mr. Menzies failed to show that his stepfathers were available, and Mr. Menzies's sister and aunt provided information about them in any event. Although Mr. Menzies's stepmother may have been available, she would have presented cumulative evidence that was already provided by Mr. Menzies's sister and aunt. Finally, the PCC concluded, correctly, that calling Mr. Menzies's teachers would have done more harm than good, since even though some of their testimony would have been sympathetic, overall it would have harmed the mitigation strategy by emphasizing Mr. Menzies's poor educational track record. For instance, one teacher noted that Mr. Menzies once stole from him.

¶197 And even though Dr. DeCaria gave extensive testimony at the penalty phase concerning Mr. Menzies's background, Mr. Menzies still claims that Dr. DeCaria failed to inform the jury of specific instances of abuse and neglect, including the fact that his mother abandoned him for multiple days at a time, that his stepfather held his hand over a flame, and that he was forced to beat a rabbit over its head and slit its throat.

¶198 The problem with all of Mr. Menzies's claims here—on everything ranging from failure to call additional witnesses to failure to raise additional specific instances of abuse and other background information through direct examination—is that the Sixth Amendment does not require that counsel present cumulative evidence. Counsel is not ineffective merely because the petitioner alleges that counsel failed to use a potential witness or introduce specific evidence. Counsel need only present a reasonable and complete mitigation defense. It does not need to be cumulative.[176]

---

[176] *See Bobby v. Van Hook*, 558 U.S. 4, 11 (2009) ("[G]iven all the evidence [counsel] unearthed from those closest to [petitioner's] upbringing and the experts who reviewed his history, it was not unreasonable for his counsel not to identify and interview every other living family member . . . .").

b. Mr. Menzies's counsel did not perform deficiently by failing to raise evidence of organic brain damage

¶199 Mr. Menzies's final penalty-phase ineffective assistance claim is that counsel failed to introduce evidence of organic brain damage (OBD)—that Mr. Menzies's brain was physically impaired in such a way that it impacted his judgment or constituted a mental disease. Mr. Menzies claims that Utah common law and Utah statutes *required* presentation of OBD and that failure to present such evidence constitutes prejudice. We reject these claims because Mr. Menzies misunderstands what is required of counsel under the law, and because introducing evidence of OBD would likely have hurt, rather than helped, Mr. Menzies's case.

¶200 First, although Utah statutes do suggest that counsel raise evidence of mental impairment or disease, including the impact of drugs and alcohol, they do not *specifically* require counsel to introduce evidence of OBD.[177] As a preliminary matter, we note that Mr. Menzies's arguments concerning Utah common law and the sentencing statute are unpreserved—they were raised for the first time on appeal.[178] And Mr. Menzies's common-law argument is unsupported by the cases he cites. Though both cases do refer to OBD, neither establishes in any way that trial counsel must present OBD evidence as a matter of effective assistance of counsel.[179] Nor does Utah's sentencing statute require OBD evidence. Counsel need only raise mental illness/mental health concerns that are appropriate under a reasonable mitigation strategy. That was done here.

¶201 At the penalty phase, counsel elicited testimony from two separate mental health experts, both of whom testified that Mr. Menzies's propensity for violence was likely to abate in prison. They also testified to Mr. Menzies's substance abuse and

---

[177] *See* UTAH CODE § 76-3-207(2)(d) (Supp. 1983).

[178] *See State v. Gulbransen*, 2005 UT 7, ¶ 48, 106 P.3d 734.

[179] *Gardner v. Holden*, 888 P.2d 608, 619 (Utah 1994) (reversing a trial court's finding of ineffective assistance on the basis that additional time to probe the nature of defendant's OBD would not have impacted the sentencing outcome); *State v. DePlonty*, 749 P.2d 621, 624–27 (Utah 1987) (holding that the trial court's refusal to find a defendant mentally ill was error where the State did not dispute a doctor's report concerning OBD).

the possibility that it directly affected him at the time of the murder. Although counsel also commissioned a psychiatrist, they did not call the psychiatrist to testify because the testimony would have hurt the mitigation defense—the psychiatrist's report focused on Mr. Menzies's violent nature and that he was unlikely to change. Although Mr. Menzies claims that counsel should have hired an additional neuropsychological examination to explore OBD and FAS, he makes no showing that counsel was required as a matter of constitutional effectiveness of counsel to explore these additional possibilities.

¶202 In fact, the evidence suggests that counsel was unaware of the possibility that Mr. Menzies had OBD or FAS and the experts counsel hired to investigate any such possibility found no supporting evidence in their inquiries. Given that "it is reasonable for counsel to rely on the judgment and recommendations of qualified experts" in developing a mitigation strategy, it was reasonable for counsel not to have explored the possibility of these additional conditions, since the three commissioned mental health experts provided no evidence suggesting to counsel that those conditions were likely to have affected Mr. Menzies's psychological condition.[180] And as the PCC recognized, there was also no direct evidence of OBD.

¶203 Finally, introducing evidence of OBD would have hurt Mr. Menzies's mitigation defense, rather than helped. Because "impulse control [would be] forever and always impaired as a result of that OBD," this would have undercut the mitigation strategy of showing that Mr. Menzies was capable of rehabilitation. Had OBD evidence been introduced, it would have supported the State's position that Mr. Menzies would continue to be violent.

¶204 In sum, Mr. Menzies's failure to investigate an OBD evidence claim fails because he has not established both that counsel's performance was deficient and that counsel's performance prejudiced his case. Counsel provided extensive evidence of his background and abuse, as well as his mental and physical health. Furthermore, counsel's failure to present OBD was in no way prejudicial to Mr. Menzies's case, since it would have undercut his position that he was capable of rehabilitation. Critically, Mr. Menzies has failed to make the requisite showing that the additional witnesses and additional information, if

---

[180] *Archuleta*, 2011 UT 73, ¶ 129.

presented, would have been enough to create a "substantial likelihood" of a sentence less than death. Accordingly, we reject his ineffective assistance of counsel arguments here.

6. Judge Uno's Affidavit

¶205 A final argument raised by Mr. Menzies as to the penalty phase of his trial relates not to ineffective assistance but instead to an affidavit provided by the sentencing judge, Judge Raymond Uno. In his affidavit, Judge Uno stated that he misapplied the heinousness factor under Utah Code section 76-5-202(1)(q) and that he should have imposed a life sentence instead of the death penalty. The PCC struck Judge Uno's affidavit.

¶206 We reject Mr. Menzies's argument that the PCC erred in striking the affidavit because Judge Uno's post-hoc reflections on the case in which he served decades ago as the sentencing judge are immaterial in the present case, and even if we were to accept his argument that Judge Uno erred in applying a single aggravating factor, the aggravating factors together would still have supported a sentence of death.

¶207 To begin, Judge Uno's reflections are immaterial here. In support of his argument that Judge Uno's assertion should be considered, Mr. Menzies cites *State v. Bobo*.[181] In *Bobo*, the judge filed an affidavit to fill a gap in the record concerning the nature of a defendant's plea. Judge Uno's affidavit is inapposite to the situation in *Bobo* in that it attempts to undo a previous judgment altogether. Furthermore, a judgment "ought never to be overthrown or limited by the oral testimony of a judge . . . of what he had in mind at the time of the decision."[182] Indeed, it is "well-settled law that testimony revealing the deliberative thought processes of judges . . . is inadmissible."[183] Although Judge Uno's decision at the time of sentencing was determinative of Mr. Menzies's case, his later post-hoc reflections are given no weight.

¶208 And even if Judge Uno did misapply the heinousness factor, we conclude that a sentence of death was still correctly imposed. The heinousness factor is one of many aggravating factors that contribute to a sentence of death. Given the many aggravating factors at issue, and as we previously concluded in

---

[181] 803 P.2d 1268, 1271 (Utah Ct. App. 1990).

[182] *Fayerweather v. Ritch*, 195 U.S. 276, 307 (1904).

[183] *Rubens v. Mason*, 387 F.3d 183, 191 (2d Cir. 2004).

*Menzies II* with respect to the sentencing court's application of the heinousness factor, "[any] error was harmless because we can still confidently conclude beyond a reasonable doubt that the remaining aggravating circumstances and factors outweigh the mitigating factors and that the imposition of the death penalty was justified and appropriate."[184]

7. Conclusion—Penalty-Phase Ineffective Assistance of Counsel

¶209 In conclusion, penalty-phase counsel's actions did not constitute ineffective assistance of counsel. Counsel began penalty-phase preparations in sufficient time, conducted a sufficient mitigation investigation, and presented a reasonable and complete mitigation defense. And even if we were to accept any of Mr. Menzies's arguments that penalty-phase counsel provided ineffective assistance, he fails to demonstrate how counsel's decisions or failures prejudiced his mitigation defense. Accordingly, we affirm the PCC's grant of summary judgment on each of Mr. Menzies's penalty-phase ineffective assistance claims. We further affirm the PCC's decision to strike Judge Uno's affidavit because his post-hoc reflections on the case are immaterial.

*D. Mr. Menzies Has Not Raised a Genuine Issue of Material Fact Regarding Appellate Counsel's Representation*

¶210 Mr. Menzies raises three challenges regarding appellate counsel's representation.[185] He argues that appellate counsel rendered ineffective assistance by (1) hiding possible *Strickland* claims, (2) failing to complete an "appellate investigation," and (3) failing to properly challenge the trial court's reasonable doubt jury instruction. We affirm the PCC's decision as to each claim and conclude that Mr. Menzies has not raised a genuine issue of material fact as to either part of the *Strickland* test.

¶211 The test for determining whether appellate counsel rendered ineffective assistance is substantially the same as the test

---

[184] *Menzies II*, 889 P.2d at 405 (internal quotation mark omitted).

[185] One additional challenge regarding appellate counsel's performance is not properly before us. Mr. Menzies argues that appellate counsel should have argued that he was denied due process by being shackled in front of the jury. As explained, *supra* ¶ 72 n.69, this claim is not properly before us because Mr. Menzies did not raise it in his Fifth Amended Petition.

for assessing whether trial counsel rendered ineffective assistance.[186] That is, the *Strickland* two-part test applies. But we have further held that where a petitioner argues that appellate counsel rendered ineffective assistance by failing to raise a claim, the petitioner "must show that there is a genuine issue of material fact with respect to whether appellate counsel overlooked an issue which is obvious from the trial record and . . . which probably would have resulted in reversal on appeal."[187] With this framework established we examine the merits of each of Mr. Menzies's claims of ineffective assistance of appellate counsel.

1. Appellate Counsel's Failure to Raise Ineffective Assistance of Trial Counsel Did not Constitute the Hiding of Ineffective Assistance Claims

¶212 LDA attorneys represented Mr. Menzies both at trial and on appeal. *Strickland* does not require counsel to raise ineffective assistance of counsel claims on appeal where the same counsel also represented the defendant at trial.[188] Rather, both the common law and the PCRA allow a petitioner who had the same counsel on appeal and at trial to raise ineffective assistance claims for the first time in post-conviction proceedings.[189] We therefore reject Mr. Menzies's argument that appellate counsel's failure to raise possible *Strickland* claims against trial counsel constituted

---

[186] *Ross v. State*, 2012 UT 93, ¶ 44, 293 P.3d 345 ("And [a]s is the case in challenges to the effectiveness of trial counsel, to prevail on a claim of ineffective assistance of appellate counsel, a petitioner must prove that appellate counsel's representation fell below an objective standard of reasonable conduct and that the deficient performance prejudiced [him]." (alterations in original) (internal quotation marks omitted)).

[187] *Lafferty*, 2007 UT 73, ¶ 48 (alteration in original) (internal quotation marks omitted).

[188] *See Fernandez v. Cook*, 783 P.2d 547, 550 (Utah 1989) (holding that where a petitioner is represented by the same person on appeal and at trial the petitioner may raise ineffective assistance claims for the first time in post-conviction proceedings).

[189] *Id.*; UTAH CODE § 78B-9-104(1)(d) ("Unless precluded by Section 78B-9-106 or 78B-9-107, a person . . . may file an action . . . for post-conviction relief [on the] grounds [that] . . . the petitioner had ineffective assistance of counsel in violation of the United States Constitution or Utah Constitution . . . .").

the hiding of ineffective assistance because appellate counsel was under no obligation to raise *Strickland* claims against itself. Appellate counsel cannot be held to have performed deficiently by refusing to make an argument they were not legally required to make.[190] And because attorneys employed by LDA represented Mr. Menzies at both trial and on appeal, appellate counsel was not required to raise a claim that they, themselves, were ineffective. Further, even if we were to characterize any potential ineffective assistance claims against trial counsel as "obvious," Mr. Menzies cannot show that he was prejudiced because he has been given the opportunity in post-conviction proceedings to argue that his trial counsel and appellate counsel rendered ineffective assistance. For these reasons we reject Mr. Menzies's argument in this regard and proceed to his remaining claims.

2. Mr. Menzies Has not Shown that Appellate Counsel Failed to Conduct a Proper Appellate Investigation

¶213 We also reject Mr. Menzies's claim that appellate counsel rendered ineffective assistance by failing to conduct a proper appellate investigation. Mr. Menzies's brief on this point is somewhat unclear, but the thrust of his argument is that appellate counsel violated NLADA Standard 11.9.2(b)[191] by failing to (1) learn that Mr. Larrabee and Ms. Brown were engaged in sexual activity, (2) investigate potential ineffective assistance claims against trial counsel, (3) realize that they needed to either obtain informed consent or withdraw from the case because of the conflict of interest created by trial counsel seeking a liability waiver from Mr. Menzies, and (4) interview Judge Uno regarding his willingness to rescind the death sentence given to Mr. Menzies.

---

[190] *See Dunn*, 850 P.2d at 1228 (holding that a petitioner's ineffective assistance claim failed because there was no basis in the law in effect at the time of the representation that would have substantiated petitioner's substantive claim).

[191] This standard states the following: "Appellate counsel should interview the client, and trial counsel if possible, about the case, including any relevant matters that do not appear in the record. Counsel should consider whether any potential off-record matters should have an impact on how the appeal is pursued, and whether an investigation of any matter is warranted." NLADA STANDARDS FOR THE APPOINTMENT OF COUNSEL IN DEATH PENALTY CASES 11.9.2(b) (1988).

¶214 We have addressed above, *supra* ¶¶ 140–43, Mr. Menzies's substantive arguments regarding the reason Mr. Larrabee and Ms. Brown were distracted at the time they saw Mr. Menzies at Storm Mountain. There we conclude that Mr. Menzies's ineffective assistance claim against trial counsel had no merit. Given this conclusion, it is necessarily the case that the claim was not an obvious one such that appellate counsel should have raised it on appeal. And even assuming that this claim was obvious, Mr. Menzies does not argue—as he must in order to prevail in an ineffective assistance of counsel claim—that asserting this claim would have probably resulted in a reversal on appeal.

¶215 Mr. Menzies's argument that appellate counsel should have investigated potential ineffective assistance claims against trial counsel is unfounded for reasons already stated.[192] Appellate counsel is under no obligation to raise its own ineffectiveness where it also represented the defendant at trial.

¶216 Mr. Menzies also argues that trial counsel's conflict of interest tainted appellate proceedings and that if appellate counsel would have conducted a proper investigation they would have learned that they needed to withdraw. We discuss Mr. Menzies's conflict of interest claim above, *supra* ¶¶ 153–65, and conclude that there was no conflict of interest because the liability waiver did not create an actual conflict between counsel and Mr. Menzies such that their interests were not aligned. Because there was no conflict at trial, Mr. Menzies's argument that the conflict also permeated the appeal must fail.

¶217 Lastly, to hold that appellate counsel rendered ineffective assistance by not interviewing Judge Uno to determine whether he was willing to rescind the death sentence would be an extreme exercise of hindsight. There is no reasonable basis for concluding that appellate counsel should have thought that Judge Uno might be willing to rescind the death sentence he imposed on Mr. Menzies. In fact, it seems quite unreasonable to expect appellate lawyers to seek testimony from a trial judge admitting that the judge erroneously imposed a sentence. Even assuming that an interview of Judge Uno by Mr. Menzies's appellate counsel would have produced this admission, any potential claim based on the information was hardly obvious from the trial record.

---

[192] *Supra* ¶ 212.

¶218 We therefore affirm the PCC's holding that Mr. Menzies has not raised a genuine issue of material fact as to each part of the *Strickland* test regarding whether appellate counsel conducted an appropriate appellate investigation.

3. Appellate Counsel's Failure to Raise a Challenge Regarding the Reasonable Doubt Jury Instruction Did not Constitute Ineffective Assistance Because the Instruction Conformed with Instructions Upheld by the United States Supreme Court

¶219 Finally, Mr. Menzies argues that appellate counsel was ineffective in failing to challenge the reasonable doubt instruction given to the jury, which Mr. Menzies claims was unconstitutional. The relevant part here instructed the jury that a "reasonable doubt" must be "a real, substantial doubt, and not one that is merely possible or imaginary."

¶220 In *Cage v. Louisiana*, the Supreme Court held unconstitutional a jury instruction equating reasonable doubt with "grave uncertainty" and "actual substantial doubt."[193] The Court noted that the words "substantial" and "grave" suggested a "higher degree of doubt than is required for acquittal under the reasonable-doubt standard."[194] This is especially so, the Court reasoned, when the words are considered with a "reference to moral certainty, rather than evidentiary certainty."[195] The Court

---

[193] 498 U.S. 39, 40–41 (1990) (The reasonable doubt instruction in full read: "If you entertain a reasonable doubt as to any fact or element necessary to constitute the defendant's guilt, it is your duty to give him the benefit of that doubt and return a verdict of not guilty. Even where the evidence demonstrates a probability of guilt, if it does not establish such guilt beyond a reasonable doubt, you must acquit the accused. This doubt, however, must be a reasonable one; that is one that is founded upon a real tangible substantial basis and not upon mere caprice and conjecture. *It must be such doubt as would give rise to a grave uncertainty,* raised in your mind by reasons of the unsatisfactory character of the evidence or lack thereof. A reasonable doubt is not a mere possible doubt. *It is an actual substantial doubt.* It is a doubt that a reasonable man can seriously entertain. What is required is not an absolute or mathematical certainty, but a *moral certainty.*" (internal quotation marks omitted)).

[194] *Id.* at 41.

[195] *Id.* (internal quotation marks omitted).

held in *Sullivan v. Louisiana* that jury instructions with errors like those identified in *Cage* were structural errors.[196]

¶221 The Court later clarified in *Victor v. Nebraska*, however, that not all definitions of reasonable doubt that use the words "substantial doubt" are unconstitutional.[197] Even though the reasonable doubt instruction at issue in *Victor* used the words "substantial doubt," the Court approved of the instruction because "substantial doubt" was contrasted with terms like "mere possibility" and "bare imagination."[198] The Court noted that this comparison made it clear that "substantial" is "used in the sense of existence, rather than magnitude of the doubt."[199] This satisfied any concern that the jury would interpret the term "substantial doubt" to overstate the doubt necessary to acquit.[200]

¶222 The jury instruction at issue here defined reasonable doubt as "a real, substantial doubt, and not one that is merely possible or imaginary." In *Carter v. Galetka*, we held that a very similar instruction was constitutional.[201] The instruction there stated as follows: "[A] reasonable doubt must be a real, substantial doubt and not one that is merely possible or imaginary."[202] The reasonable doubt instruction here, like the instruction in *Carter*, compares a "substantial doubt" with those that are "merely possible or imaginary." Like *Victor*, the comparison is in "the sense of existence rather than magnitude of the doubt."[203] Any challenge raising the constitutionality of the reasonable doubt instruction given in this case would have surely failed for these reasons. It follows that it would have hardly been obvious to appellate counsel to challenge the instruction. Further, because the merits of the challenge would have been unsuccessful, Mr. Menzies cannot make a sufficient showing that making the claim would have probably resulted in reversal. For these reasons we affirm the PCC's grant of summary judgment, since

---

[196] 508 U.S. 275, 281–82 (1993).

[197] 511 U.S. 1, 19–20 (1994).

[198] *Id.* at 20.

[199] *Id.*

[200] *Id.*

[201] 2001 UT 96, ¶ 51, 44 P.3d 626.

[202] *Id.* (internal quotation marks omitted).

[203] *Victor*, 511 U.S. at 20.

Mr. Menzies fails to raise any genuine issue of material fact concerning counsel's failure to challenge the beyond a reasonable doubt instruction.

4. Conclusion—Appellate Proceedings Ineffective Assistance of Counsel

¶223 We conclude that appellate counsel did not render ineffective assistance of counsel. Appellate counsel had no obligation to raise ineffective assistance claims against themselves. Counsel adequately investigated Mr. Menzies's case. And counsel was not ineffective in failing to challenge the beyond reasonable doubt instruction because the claim would have almost assuredly failed. For these reasons we reject Mr. Menzies's claim that appellate counsel provided ineffective assistance.

**Conclusion**

¶224 None of Mr. Menzies's claims have merit. We reject each of his constitutional challenges to the PCRA and further conclude that the PCC did not abuse its discretion in denying further funding under the PCRA. We also reject each of his procedural claims. First, rule 65C of the Utah Rules of Civil Procedure allows the State to move for summary judgment rather than file an answer. Second, the PCC's decision to deny his request for a rule 56(f) continuance was not an abuse of discretion. And third, the PCC did not abuse its discretion in denying him an evidentiary hearing before ruling on the cross-motions for summary judgment. Finally, we conclude that each of his ineffective assistance claims fail because he has not raised a genuine issue of material fact concerning each prong of the *Strickland* test.

¶225 In sum, we affirm the PCC's order granting summary judgment to the State and dismissing Mr. Menzies's petition for post-conviction relief.

———————